A. FRITZ and J. E. GROH, Partners under Firm Name of HOBERG MILLING COMPANY, Plaintiffs in Error, v. ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY.

**Division One, May 31, 1912.**

1. **APPEAL: Substantial Right: Demurrer: Error in Instructions, Evidence, etc.** If plaintiff is allowed all his competent proof and makes no case on the facts on which liability can be predicated and is unsuccessful at the trial, error in defendant's instructions, or error in the admission of evidence on defendant's part, does not materially affect the merits of the action or substantial rights of plaintiff. If plaintiff made no case for the jury, a judgment for defendant will not on appeal be reversed because of error in defendant's instructions or in the admission of evidence in his behalf.

2. **FIRE: From Railroad Engine: Negligence.** Under the statute (Sec. 3151, R. S. 1909), making a railroad company liable "to every person and corporation whose property may be injured or destroyed by fire communicated directly or indirectly by locomotive engines in use upon the railroad," it is not necessary to either allege or prove negligence in order to fasten liability on the railroad company, but it is necessary to charge and prove that the fire was actually communicated to the property by a locomotive engine in use on defendant's railroad. Plaintiff cannot recover by mere proof of a fire in a building adjoining the track and the presence of a locomotive on the track.

3. **DEMURRER TO EVIDENCE: Things Taken as True, etc.** On a demurrer to the evidence, defendant's testimony, where contradicted, is taken as false; plaintiff's whether contradicted

Fritz v. Railroad.

or not, is taken as true; and discrepancies, contradictions between witnesses or self-contradictions by a witness, together with the credibility of the witness and the weight to be given to his testimony, are for the jury. Plaintiff is entitled to the grace of having allowed every inference springing reasonably from the proof.

4. ————: Circumstantial Evidence: Fire from Railroad Engine. Where the evidence relied on to show the origin of the fire is strictly circumstantial, it should have a tendency to exclude any other conclusion than the principal or ultimate fact. The soundest test of the validity of that sort of evidence is, that no other theory than the hypothesis upon which the conclusion is based, can be formed.

5. ————: ————: Insufficient to Sustain Verdict for Plaintiff: Fire from Railroad Engine: Erroneous Instructions and Evidence for Defendant. And tested by that rule it is *held* in this case, after a full review of the evidence and allowing as true all of it in plaintiffs' favor, and drawing therefrom every favorable inference, that no verdict for plaintiffs could be permitted to stand, since the whole trend of the testimony points to the conclusion that the fire originated inside their mill, and that it was communicated from defendant's engine is at best only possible conjecture; and, therefore, any error in instructions given for defendant, and any evidence in its behalf erroneously admitted, are not substantial error and will not authorize a reversal of the judgment based on a verdict for defendant, and is therefore not considered.

6. ————: ————: Fire from Railroad Engine: Sparks in Other Instances. In a suit to charge a railroad company with having set fire to plaintiffs' mill by sparks from its locomotive engine, it is permissible to show the distances a locomotive may throw a spark and ignite combustible matter; but the value of that sort of testimony depends upon similar conditions of wind and weather and surrounding circumstances, and should be so limited.

7. ————: Verdict Based on Conjecture: Set Aside by Trial Court. A verdict for plaintiff unsupported by the evidence and based upon mere conjecture, should be set aside by the trial court; and where that would have been its duty, a verdict for defendant will not on appeal be disturbed.

Appeal from Lawrence Circuit Court.—*Hon. F. C. Johnson*, Judge.

AFFIRMED.

*J. V. McPherson* and *Fyke & Snider* for plaintiffs in error.

(1)   The court erred in permitting counsel for defendant, in his opening statement, to state to the jury: "I allege they were fully insured, and were fully paid by the insurance company, that the insurance company took a subrogation and there is no authority for the plaintiffs to sue." And the court erred in overruling plaintiff's objection to that statement.   Gore v. Brockman, 138 Mo. App. 231; Fuller Co. v. Dassagh, 101 Ill. App. 664; Marigold v. Traction Co., 80 N. Y. Supp. 861; Iverson v. McDonald, 36 Wash. 73.   (2)   It was erroneous and highly prejudicial to permit defendant to get before the jury the fact that plaintiffs had insurance and had collected insurance money.   Matthews v. Railroad, 142 Mo. 645; Erhart v. Railroad, 136 Mo. App. 617; Foster v. Railroad, 147 Mo. App. 547.   (3)   The court erred in overruling plaintiff's objection to these questions: "Q. Up to that time had you heard it contended in Groh's presence that somebody had broken into the mill and set it afire?   Q.   Did you ever hear it contended that the railroad had set it afire until after the adjuster came there and the insurance company had settled?" (4)   One man is as capable of judging how far a spark will fly and live as another.   It is not a question for experts.   It is for the jury, upon all the facts to determine that question.   Glasgow v. Railroad, 191 Mo. 347; Rogers on Expert Testimony, p. 8, sec. 5, p. 18, sec. 10; Graney v. Railroad, 157 Mo. 666; Hurst v. Railroad, 163 Mo. 309; Ayers v. Railroad, 190 Mo. 228; Lee v. Knapp & Co., 155 Mo. 641.   (5)   The court erred in overruling defendant's objection to these questions propounded by defendant to its section foreman: "Q.   Did anyone come to you to secure or borrow matches?   Q.   What did he say?"   Such evidence was purely hearsay and ought to have been

excluded.   Field v. Railroad, 113 Mo. App. 645.   (6)
The conduct of defendant in making its offer of proof,
in the presence of the jury, to the effect that plain-
tiffs had been paid $4900 insurance money; that one
of plaintiffs' counsel was present assisting plaintiffs,
and that he represented the interests of the insurance
company in this litigation; that the policy of insur-
ance contained a subrogation clause, notwithstanding
the court sustained plaintiffs' objections to each of
the foregoing offers, was prejudicial, and such offers
should have been made.   Iverson v. McDonald, 36
Wash. 73; Marigold v. Traction Co., 80 N. Y. Supp.
861.   (7)   The court erred in giving this instruction
for defendant:  ''The court instructs the jury that
the evidence upon which the plaintiffs seek to recover
in this action is purely circumstantial, and if the jury
find that the circumstances connected with the origin
of said fire are more consistent with the theory that
it caught from some other source than that it was set
out or communicated by an engine of the defendant,
your verdict will be for defendant.''  It is a comment
on the evidence and the weight thereof. There was no
substantial evidence upon which to base a theory that
it caught from some other source.

Robert T. Railey and Edward J. White for de-
fendant in error.

(1)   The plaintiffs' evidence was insufficient to
establish any reasonable probability that the defend-
ant's engine had set their mill on fire; and the evidence
of the plaintiffs showing that the fire was not dis-
covered for over three hours after the defendant's
train passed, and failing to show that the engine pull-
ing the train was emitting sparks at the time, or that
this engine had ever emitted sparks and the evening
being damp, misty and snowy and the air full of mois-
ture, plaintiffs failed to establish a prima facie case

243 Sup.—5

for the jury, and the defendant's demurrer to the evidence of the plaintiff should have been sustained. Gibbs v. Railroad, 104 Mo. App. 276; Manning v. Railroad, 137 Mo. App. 631; Peck v. Railroad, 31 Mo. App. 123; Bank v. Railroad, 98 Mo. App. 330; Peffer v. Railroad, 98 Mo. App. 291; Funk v. Railroad, 123 Mo. App. 169; Otis v. Railroad, 112 Mo. 622; Sheldon v. Railroad, 29 Barb. 226; Railroad v. De Groff, 29 Pac. 664; 1 Amer. & Eng. Ency. Law, 512; Wheeler v. Railroad, 67 Hun, 639; Railroad v. Morton, 3 Colo. App. 155; Railroad v. Blatz, 114 Ind. 661; Musselwhite v. Railroad, 4 Hughes (U. S.), 166; 13 Amer. & Eng. R. Cas. 479. (2) It was not error under the defense pleaded in the answer, to prove that the plaintiffs had been fully paid the entire value of their property by the insurance company and that the cause of action had been assigned to the insurance company, and instead of excluding this defense the court should have permitted it to stand before the jury. (a) This defense was a proper one, because the insurance company, upon the payment of the value of the property destroyed by the fire, was subrogated to the extent of their payment, to the remedies of the insured and succeeded to the entire cause of action in controversy. Ins. Co. v. Railroad, 74 Mo. App. 106; Sheldon on Subrogation, sec. 230; Ins. Co. v. Railroad, 149 Mo. 177; Railroad v. Ins. Co., 139 U. S. 223; Railroad v. Ins. Co., 59 Kan. 432; Ins. Co. v. Railroad, 73 N. Y. 399; Ins. Co. v. Railroad, 132 N. C. 75; Ins. Co. v. Walsh, 18 Mo. 230; Clark v. Ins. Co., 19 Mo. 54; Ins. Co. v. Stave Co., 61 Ark. 1; 24 Am. & Eng. Ency. Law, 193; Ins. Co. v. Hutchings, 21 N. J. Eq. 107; Ins. Co. v. Railroad, 73 N. Y. 399; Blanchard v. Engine Works, 142 Mo. App. 319; 4 Cooley's Briefs on Ins., pp. 39, 27; Allen v. Railroad, 94 Wis. 93. (b) The action being at law, under the code of this State, if the plaintiffs had been paid the full value of their property and had assigned the right to recover for any destruc-

tion thereof, the action would have to be brought in the name of the insurance company as the real party in interest. R. S. 1909, sec. 1729. Under this provision of the code, the assignee is the real party in interest and must sue in his own name. Dickey v. Porter, 203 Mo. 1; Spelter Co. v. Ins. Co., 71 Mo. App. 658. (c) But whether the defense pleaded in the answer was competent or not, in striking it out and in refusing to admit evidence to establish that defense and in giving the plaintiffs' instruction 1, telling the jury that the fact that the property had been insured and that the plaintiffs had received certain money from the insurance companies, could not in any manner diminish the plaintiffs' claim against the defendant, if its engine had burned the mill, any possible error resulting from the statement of plaintiffs' counsel to the jury and the reading of this defense set up in the answer, was forever taken away from the defendant and any possible injury to the plaintiff from counsel's statement in connection with this defense, was fully cured. Peck v. Traction Co., 131 Mo. App. 143; State v. Gregory, 170 Mo. 598; Smith v. Butler, 48 Mo. App. 663; Lumber Co. v. Hartman, 45 Mo. App. 647; Obert v. Strube, 51 Mo. App. 621; Ruth v. Railroad, 70 Mo. App. 190; Wendler v. Furnishing Co., 165 Mo. 127.

LAMM, J.—Plaintiffs (a firm) owned and ran a grist mill hard by defendant's railroad at a way station, Hoberg, in Lawrence county. In the shank of the evening of January 10, 1908, mill and contents (barring a salvage of the boiler and engine, put at $1000 to $1500) were burned. Alleging the fire caught from defendant's locomotive, plaintiffs sued in the Lawrence Circuit Court, putting their damages at $17,163.10.

On issues joined, the jury found for defendant. From a judgment following, plaintiffs appeal—assign-

ing error in that the court permitted counsel in his opening statement to make prejudicial remarks, admitted incompetent testimony, permitted repeating prejudicial questions, erred in refusing to strike out testimony and in giving an instruction. For defendant it is argued, *contra*, that there is no such error. Further, in effect, that plaintiffs made no case; hence (counsel say) an asked demurrer to the evidence should have been given, and that such alleged error, if any exists, does not affect the merits or concern an appellate court.

Such, in outline, are the issues below and here.

I. The administration of justice cannot be too often or too much quickened by recourse to salutary statutes intended to produce just practical results—this, as over against the vulgar and pernicious fallacy that a law suit on appeal is a mere *game of wits* to be played according to highly artificial rules, over which "game" we sit as a mere umpire, according points to one player or another by the dry and lifeless rules of the game for the sake of the game itself. Elevated and uniform justice could not be administered without rules. If there were no rules, we would be governed by *men*, not *laws*, by *discretion*, a crooked metewand, not by fixed rules known to all.    Order is not only Heaven's first law, but order is of the essence of the science of jurisprudence. But rules are not the ultimate end, the main thing—that main thing is justice itself, the very right of the matter.    The rules are only in aid of that main thing—the working tools whereby it is attained.

Section 1850, Revised Statutes 1909, reads: "The court shall, in every stage of the action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party; and no judgments shall be reversed or affected by reason of such error or defect."

Section 2082, Revised Statutes 1909, reads: "The Supreme Court, or courts of appeal, shall not not reverse the judgment of any court, unless it shall believe that error was committed by such court against the appellant or plaintiff in error, and materially affecting the merits of the action."

In establishing a working theory to administer those statutes, it is stiffly held that if a plaintiff is allowed all his competent proof and makes no case on the facts on which liability can be predicated and is unsuccessful below, then error in his adversary's instructions, or in the admission of evidence on the part of such adversary, cannot "materially affect the merits of the action," or "the substantial rights of the adverse party." In such case (as to an appealing plaintiff), at bottom there are no merits and no substantial rights in the eye of the law. [Trainer v. Sphalerite Mining Co., 243 Mo. 359.]

At the threshold, then, lies the question: Did plaintiffs make a case for the jury? If that question be answered, no, then mere error in instructions and in the admission of evidence on behalf of defendant is afield and fills no office at all on appeal under the quoted statutes; for the result, despite the error, was right. If right, it abides. We will not undo what has been done, in order that some intermediate move in the (so called) "game" may be corrected only to get the same result again. If, yes, then error in the way the case was put to the jury at once takes on new color and becomes of substance.

II. *Of the facts.* Attending to them, defendant's right of way at Hoberg is one hundred feet in width and its track lies in the center. There is a bit of obscurity on the point but from what follows we take it the track runs southeast and northwest. Plaintiffs own a tract abutting on said right of way. Its description with other substantial testimony indicates

that defendant's road ran to the northwest. Plaintiff's mill stood broadside parallel to the right of way, four or five feet therefrom, and, say, fifty-four feet from the track, and must have had the same relation to the cardinal points of the compass. This has some significance, taken with the way the wind sat the night of the fire. In the afternoon and evening of January 10, 1908, there was a high wind blowing from the northwest. Obviously the same direction of track and wind is a factor in determining the course locomotive sparks would take. It is more convenient, however, to refer to the mill and track as running east and west and witnesses now and then drop into that form of expression. So, it was very cold the afternoon and evening of the fire. All agree it was foul weather— damp, misty and threatening. Some say rain fell in that region in the afternoon. Some, that it snowed in the evening, at least, during the fire. The mill, a wooden structure of sixty-barrel capacity, was newly built, partly of old material. There was a main building of three stories, with additions of an engine room and a wareroom, each one story. The wareroom ran along the entire east end of the main mill. The engine room ran along its west end, but lacked twelve feet of being as near the track. The main mill was covered by a composition roof—the engine and warerooms, with galvanized iron. The mill was completed, except wheat bins and the wareroom, and carpenters were working on them. Windows were in and doors hung except one—a large door on the north side of the main mill, fronting the track and intended to shove to and fro on rollers. That door was fastened shut on occasion with eight-penny nails. At such times it was not nailed "solid," but was secure. On warm days they took this door away. For a week before January 10 there had been no fire in the engine room, but the mill, theretofore grinding, was open for business, occupied by the proprietors plying their

calling as millers, and by carpenters on that day. Heat was furnished at the time by a coal oil stove in a room called the "office," when the engine was not running. On January 10 that coal oil stove was running. Witnesses vary on the time the mill men quit work and left, closing it for the evening, but it was nigh five o'clock; its windows were fastened and doors locked, except the north door and that was nailed up as usual. As we grasp it, there was a rule made by Groh against smoking in the mill, but, as he made the rule, he accommodatingly waived it in his own favor, smoking cigars and pipes in the office. This office was in the southeast corner of the main mill, next the wareroom. Groh testified that he turned down the oil stove before leaving the mill; that his habit was to see it out before he went away. Stored in the mill were some hundred bushels of wheat, 10,000 pounds of flour, 3000 pounds of feed, 190 bushels of corn, two barrels of oil and a barrel of oil waste, the latter in the northwest corner of the mill proper, and some clothes close by. All agree that a young man named Owens discovered the fire and first gave the alarm. He puts himself at church about two miles from Hoberg and, according to his watch, left church at about a quarter to nine. He drove in a buggy the two miles to Hoberg and discovered the fire at about a quarter after nine, when some distance away. He then drove to the Creymeyer house where Groh was sleeping (a house about one-fourth of a mile from the mill), awakened him and others and then drove north of the mill. At first he saw the blaze coming around the southwest corner of the engine room. Afterwards, when on the north of the mill, he saw the fire in the northwest corner of the main building, both in the inside and on the outside, and the weather-boarding there was burnt through. When he saw the fire at the southwest corner of the engine room it was a blaze about the size of a small brush pile. There was other testimony that Owens

gave the alarm at Creymeyer's house at about a quarter to nine, instead of a quarter after. At any rate, it was so late that the Creymeyer household, including Groh, were in bed at that time. After Groh and the others there dressed and got to the mill, as said one-fourth of a mile away, they tried to get in at the office window on the south side, but it was too smoky. They next went to the engine room and tried to get in, but it was too smoky there. Afterwards they went round to the north and west and found the fire along the north side of the mill, more of it to the west than to the east of the main door on the north, and as near as they could make out burning most fiercely in the northwest corner. The building collapsed within a half hour after they got there. Before that there was an explosion and it seems there was a stick of giant powder with a fuse and fulminating cap in the mill, left over from digging a well. All agree that the nailed-up door on the north was then open. It was pushed back on the top, resting against a bench in a slanting position, but was not on fire. Along the west end of the main mill, up aways, about where the roof of the engine room was to be joined to the west wall, there was a space left in the weather-boarding when the main mill was built. Presently, when the roof of the engine room was joined to this main wall, this space was not entirely closed, and, as we understand it, there was a strip of weather-boarding off there, about three inches in width, and things were in this fix on January 10th. The railroad track ran by the mill in a little cut and this missing strip of weather-boarding would be a trifle higher than the top of a locomotive smokestack. Locomotives had been daily passing and repassing while the mill was building and shavings and other combustible debris were scattered around, but before January 10th no fire had caught from sparks. There was testimony that fire had caught from such engines in the grass and in a rail

pile in the neighborhood at uncertain times prior to this fire, some at a less and some at a greater distance away than the mill stood from the track; but no one had ever seen an ember smoulder for three hours. All of such fires were observable within a short time after the passage of a locomotive. There was also testimony that at some uncertain time after the fire in the mill sparks now and then fell from passing locomotives as far as the mill basement. Plaintiff's theory is that the fire started about six p. m. from sparks thrown by a locomotive heading west in the teeth of the wind and drawing a light passenger train of three or four cars. There is no testimony that this particular engine set any of the other mentioned fires. To the contrary, it had been in the shop, was overhauled there, and came into use in prime condition about two weeks before the fire. It is established by the proof, with no countervailing testimony, that the state of the weather (whether cold, hot, dry, damp or heavy) has a great deal to do with the life of sparks thrown from a locomotive; that when it is very cold or damp sparks do not live as long or fly as far as when it is warm or dry. Weather conditions existing at the times the other fires started or sparks fell, testified to by witnesses, are not disclosed. There is testimony that all locomotive engines throw some sparks. The plan in use on defendant's locomotives to prevent the escape of coals of fire, as distinguished from sparks, is by means of a spark arrester. Such arrester is a composite device having a baffling sheet and a steel sheet or sieve with very small meshes, three thirty-seconds of an inch in diameter. This appliance on this engine was in good order at the time. When the draft is on the fire box so there is a tendency to lift coals of fire, such coals first strike the baffling sheet and are there mechanically pounded and pulverized by attrition and beating into a less size than the small meshes in the sieve before they can escape by

passing through it and out of the smokestack into the
air. The station at Hoberg is six or seven hundred
feet east of the mill. The train in question stopped at
the station January 10th at about five forty-eight p.
m., the usual time. There was some testimony it was
on time. But plaintiffs' testimony indicates it was
a little late, say, five or ten minutes, making it about
six o'clock when it passed the mill. If the train was
on time, then on Owens' testimony the fire was dis-
covered over three hours after its passage. If a little
late, as plaintiffs' evidence shows (and we must as-
sume it was on demurrer), then it was nearly three
hours before the fire was discovered. There is no tes-
timony contradicting Owens on the size of the fire at
the time he first saw it, and there are no facts shown
making it improbable, in the keen gale then blowing,
that thereafter a fire, of the size seen by Owens, could
not have reached the fury and volume shown by the
other witnesses when (getting out of bed, dressing
and going on foot one-fourth of a mile) they got to
the mill. When working steam up grade there are
more sparks thrown by a locomotive then when run-
ning down grade, and more sparks from an old fire
in the fire box than from a green fire. It was usual
in starting the train west from the station house at
Hoberg to make a green fire by shoveling in fresh coal
and the steam is worked to gather headway after the
start. At the mill there would be a light pressure of
steam. There is not a particle of testimony that the
particular engine drawing this passenger train, leav-
ing the Hoberg station at, or a little before, six p. m.,
on January 10th, threw any sparks. No witness saw
it throw any, though they saw the train and engine,
and the testimony is to the effect that in the nature of
things it could throw off very few, if any, and those
not amounting to much. Out of forty or fifty times
one witness had seen it go by, he saw it throw sparks
four or five times, but whether before or after the

fire is dark.  Mr. Groh said at the fire that somebody
had broken that door open (referring to the nailed up
door on the north side).  A witness said to him:  "It
has been too long for a train to have set it."  To that
he replied:  "Yes, there has been no train for over
three hours."  He told another witness he did not
know how the fire originated.  Plaintiffs' attorneys
elicited from one of their own witnesses that there was
talk at the fire to the effect it was of incendiary origin
and that there had been trouble with reference to dig-
ging a well at the mill.  A witness for plaintiffs,
who went to the post office after supper to get mail
brought in on the train, had a chance to see and saw
no fire at the mill.  Another, who lived not far from
the mill and whose bedroom window faced the north
side of the mill, saw no fire when he retired about an
hour and three-quarters after the train had passed.

Defendant was allowed to show, over objection,
that a stranger came to defendant's section house
from the direction of the mill that evening after the
train passed and wanted work, said he would have to
lie out, borrowed some matches to build a fire and re-
turned in the direction of the mill.  Defendant, over
objection, at first was allowed to show that the mill
was insured, that the insurance was paid after the
fire, that the policy had a subrogation clause in favor
of the company if a fire was caused by a railroad, and
that the insurance company was interesting itself in
the prosecution of the suit.  Later the court changed
position and the same character of testimony was
ruled out.  Plaintiffs got an instruction commanding
the jury to disregard the matter of insurance.  De-
fendant was permitted to show by experts, over ob-
jection, how far a spark from a locomotive under pre-
vailing weather conditions could fly and live, and how
far a spark would have to go to reach the mill, keep-
ing in view the direction of the wind and the distance
of the track.  The details of all the aforesaid testimony

may be omitted. Nor we need not say on demurrer
whether there was error in that behalf, since, as al-
ready held, if plaintiffs fail to make a case, such rul-
ings could not be reversible error.

On such record, we rule as follows:

(a)  The action is brought under the statute (R. S.
1909, sec. 3151) enacted in 1887 (Laws 1887, p. 101).
Grounded in natural equity and held a constitutional
exercise of the police power (Mathews v. Railroad,
121 Mo. l. c. 315), resting also on the maxim, ''Every
one should so use his own property as not to injure
that of his neighbor'' (Campbell v. Railroad, 121 Mo.
l. c. 346), that statute with a single stroke cut away all
necessity of pleading or proving negligence in order
to fasten liability on a railway company for damages
from fire escaping from its engines. It was a revolu-
tion in existing law, was remedial, and is to be liber-
ally construed. It runs on the theory that such com-
pany, speeding its trains through the country by
steam power, in using so good a servant as fire when
kept in bounds, but so hard a master when set free,
was henceforth responsible for the ravages of a fire
set out by its locomotives. It means that, regardless
of fault, the one must pay the damages who caused
loss by that particular kind of a fire. To prove the
negligent escape of fire from a locomotive, here one
instant and gone the next, and manned by unknown
men, was an almost impossible task, and the law-maker
took off that burden. So far as material, the statute
reads: ''Each railroad corporation owning or oper-
ating a railroad in this State shall be responsible in
damages to every person and corporation whose prop-
erty may be injured or destroyed by fire communicated
directly or indirectly by locomotive engines in use up-
on the railroad owned or operated by such railroad
corporation.  . . .''

Observe, while negligence is no longer a factor,
and plaintiff is relieved from the burden of charg-

ing or proving it, yet he still carries a burden. He cannot recover by mere proof of a fire and the presence of locomotives on a railroad. He must still charge and prove that the fire was actually communicated to his property by one of defendant's locomotives in use on its road. Failing in that, he is cast as a matter of law.

(b) On demurrer to the evidence, the right doctrine to go by is: Defendant's testimony, where contradicted, is taken as false; plaintiff's, whether contradicted or not, is taken as true; discrepancies, contradictions between witnesses or self contradictions by witness, together with the credibility of the witness and the weight due his testimony, are for the jury, not the court. So, plaintiff is entitled to the grace of having allowed in his favor every inference springing reasonably on the proof.

Not unmindful of those precepts, but applying them in full vigor, we are of opinion the facts disclosed were not sufficient to carry the case to the jury.

This, because:

(c) The facts have been set forth so fully that there is no call to restate them and little to comment on them.

(1) The evidence relied on to show the origin of the fire is strictly circumstantial—that is, the main fact, viz., the cause of the fire, stands to be proved by the proof of surrounding conditions and circumstances "whose existence.is a premise from which the existence of the principal fact may be concluded by the necessary laws of reasoning." (Bl. L. Dict., under "Circumstantial Evidence.") "The soundest test of the validity of that sort of evidence is, that no other theory but the hypothesis upon which the conclusion is based, can be formed." [Per HUGHES, J., in Musselwhite v. Receivers, 4 Hughes (U. S. Cir. Ct. Rep.) l. c. 169.] In circumstantial evidence the principal and ultimate fact is got at by way of argument and

by method of demonstration in the nature of *reductio
ad absurdum.* [Will's Cir. Ev., p. 17.] Therefore, in
cases turning on circumstantial (or what is called by
the civilians *oblique* and by the Scotch jurists *argu-
mentative*) evidence, the proof should have a tend-
ency to exclude any other reasonable conclusion than
the principal fact. Says the author just quoted (p.
17): ''The force and effect of circumstantial evi-
dence depend upon its incompatibility with, and inca-
pability of, explanation or solution upon any other
supposition than that of the truth of the fact which
it is adduced to prove.''

(2) Testing the facts by the general principles
announced we see no way out of it except to hold that
plaintiffs did not show that defendant's locomotive
directly or indirectly communicated fire to their mill.
There is not a particle of evidence tending to show
that a spark, keeping in its whole course so alive and
hot as to breed a fire when it lit, could fly or ever flew
as far as such spark would have to carry in this in-
stance and in a gale of as cold and damp a wind.
There is no testimony tending to show that a fire
would lurk and smoulder for the length of time this
must have done, if it is to be credited to defendant's
locomotive. Common observation does not teach us
that fires, catching in tinder or debris, hesitate so
long. Usually in cases finding their way into courts
for damages for setting out fires, they develop shortly
after a locomotive has passed, and the significance of
*time* has been a topic of judicial comment in those
cases. The whole trend and thread of the proof point
to the conclusion that the fire originated inside the
mill. Indeed, in damp conditions prevailing, it could
not in reason have caught on the outside, therefore the
spark must have got inside the mill. To account for
a spark falling inside, a three-inch crevice in the weath-
er-boarding on the west side is shown. Where it led
to in the inside is not shown. Did it lead to the floor.

to a sill or to the ground? Assuming it led into the main mill, then according to the physics of the matter, a spark (from a locomotive running to the northwest in the teeth of the gale) would have to travel nearly on a dead level for a great many more than fifty-four feet before it could reach that particular hole in the west wall, for we know the smokestack would have to be smartly to the west of the mill, before a wind from the northwest could carry the spark to that hole. That such spark would live in the cold and damp, reach that crevice and breed so late a fire inside of the mill rests necessarily in speculation, and has all the loose and inconclusive features earmarking guesswork and conjecture as distinguished from sound reasoning. Did tramps inadvertently or some enemy intentionally set the fire? Did mice gnaw matches in some coat pocket, or did the coal-oil stove explode because turned down low and not out? Or did the barrel of waste set fire to the mill by spontaneous combustion? Who knows? Strange things might happen in that way, and whether they did or not would be conjecture pure and simple. But some of those strange things would be just as reasonable as to say that a spark from a locomotive (that was not seen to throw any) flew on a level for, say, seventy-five or one hundred feet and accurately hit a three-inch crevice in a wall; that it then was red hot, though the air was cold and damp; that it then fell on combustibles inside the mill and started a fire; and that such fire smouldered for three hours (a little more or less) before discovery by those situated so as to likely see it. That hypothesis is also conjecture pure and simple. No conclusion that such result was likely or reasonable could flow from sound reasoning of such premises. At very best one could only say, it was possible, it might be so. Shall we say the proof shows that defendant *might* have set the fire or *might not, ergo,* defendant must pay? On such theory, defendant would always have to pay, and the

statutory duty of showing that defendant's locomotive communicated the fire would be eliminated. We could not very well adjudicate on such a *toss up* and *non sequitur* as that. Speaking of cold weather as discouraging to long life in a spark of fire, who has not got up of a bitter morning to find his household fire frozen out? At such times one is—but no matter about that.

It is true that testimony is permitted in this character of cases to show the ability of locomotives to throw sparks to this, that or the other distance, and, when so thrown, to show they ignite combustible matter. But the value of that sort of testimony, in the nature of things, should be limited to similar conditions of wind and weather and surrounding circumstances. We know nothing of the state of the weather, or the direction of the wind, or the character of the combustible material (except grass) set on fire theretofore in that region by locomotive sparks. The proof fell short on that score. So, there is no testimony whatever that the engine in question threw any sparks on the evening of the 10th of January, 1908, likely to cause a fire. So, does not the fact that the door on the north was found pushed in, point to the probable presence of intruders in the mill after closing time?*

If the jury had found for plaintiffs, it would have been the duty of the trial court to set the verdict aside as unsupported by proof. Under facts more persuasive than here, that result has been reached more than once. [Gibbs v. Railroad, 104 Mo. App. 276; Manning

---

* We are not at liberty to conclude that the wind blew this door in before the engine passed and a spark blew in the open doorway, for it was nailed securely and there is no testimony tending to show it could be blown in by the wind. But if we gave evidence to such surmise, then we confront the fact that the fire apparently did not spring up about the doorway and further past that a spark would have to fly and keep alive about as far as to enter the crevice in the weatherboarding.

v. Railroad, 137 Mo. App. 631; Peck v. Railroad, 31 Mo. App. 123; Bank v. Railroad, 98 Mo. App. 330; Funk v. Railroad, 123 Mo. App. 169; Otis Co. v. Railroad, 112 Mo. 630-1.]

In the foregoing view, other questions are not reached and will be reserved.

The judgment was right. Let it be affirmed. It is so ordered. All concur; *Graves, P. J.,* in separate opinion.

## CONCURRING OPINION.

GRAVES, P. J.—I concur in this case for the same reasons expressed by me in the case of Trainer v. Sphalerite Mining Company just decided and reported in 243 Mo. 359, to which reference is hereby made. ·