# LEE TRAINER, Appellant, v. SPHALERITE MINING COMPANY.

### Division One, May 31, 1912.

1. **NO CASE FOR PLAINTIFF: Error in Instructions: In Admission of Testimony.** Error to be reversible in a civil action must affect the substantial rights of the losing party. Where there is no case made for plaintiff, there is no error affecting his substantial rights or the merits; and error in the instructions for defendant and in the admission of incompetent testimony will not work a reversal.

   GRAVES, J., concurs, not because the statutes (Secs. 1850 and 2082, R. S. 1909) prohibit a reversal unless there has been error materially affecting the merits and affecting the substantial rights of the adverse party, but only because those statutes express the rule of conduct fixed by the courts themselves, which had been established long before those statutes were enacted. Said statutes are not binding upon the courts, nor are any others of like tendency. The Legislature cannot stifle the conscience of courts in their decision of cases. The Constitución prevents one magistracy from interfering with the duties of another.

2. **NEGLIGENCE: Master and Servant: Miner: Premature Explosion.** Where plaintiff charged the premature explosion of the powder in a drill-hole and his consequent injury to the master's negligence in changing, without notice to him, the powder from a giant powder of forty per cent nitroglycerine, which he had been using, to a giant powder of fifty per cent nitroglycerine, which was more explosive, and to the negligent preparation of the "shot" which caused the explosion; and there is no substantial evidence that any change in the powder was made, and he knew of the defective wrapper of the shot, and knew more of the particular hazard from such defect than the master, he cannot recover.

3. **EVIDENCE: Change in Powder: Supposition of Witness.** Testimony by one witness that he thought the company had substituted one kind of powder for another, is not substantial proof of a change in the powder theretofore used by plaintiff.

4. **NEGLIGENCE: Miner: Superior Knowledge: Defective Tool.** The powder was furnished in sticks about eight inches long and one in diameter. A stick equipped with a fulminating cap attached to a fuse was called a "shot," and to attach a cap a hole was punched sideways in the shot wrapper. The sticks

were put into a deep drill-hole one at a time by a tamping bar, which was a gas pipe with a wooden plug in one end ten or twelve inches long, in the end of which was a nail. Plaintiff had put in three sticks, and when ready to insert the shot he found the cap lying near by, and out of the cap hole, which was too big to hold the cap in place, and that the paper wrapping was torn at the cap hole. He put in the cap, but it came out; he had no knife to make a new cap hole, but remembering that he had used a shot of that kind three or four times in his years of mining experience, he thought he could use it safely, and accordingly put the cap back in the hole, and pushed the shot four or five feet down the drill-hole with the tamping bar, and while engaged in ramming it the powder was touched off in some mysterious way. The defendant's foreman did not know that the cap would not stay in the hole, though there is some evidence that he knew there was a rent in the wrapper, nor did he know that the drill-hole was in flint formation. *Held*, that plaintiff, knowing better than his master the increased hazard due to the defective shot and that he could have had a perfect one for the asking, cannot recover on the theory that the master was guilty of a negligent preparation of the shot.

5. ————: **Master's Care of Servant.** The master need not, either actually or constructively, hover over every transaction to keep the servant from hurting himself at his work, who has the means at hand to avoid injury, knows the danger of using the instrument whose defective condition he has discovered, and with a contempt for peril persists in courting danger and injury.

6. ————: ————: **Danger Imminent.** Where danger is glaring, imminent and such as no reasonably prudent man would take at his own risk, the master is not liable, absent a command from him to the servant.

Appeal from Lawrence Circuit Court.—*Hon. F. C. Johnston*, Judge.

AFFIRMED.

*I. V. McPherson* and *John L. McNatt* for appellant.

(1) The court erred in admitting incompetent and illegal evidence offered by the defendant. Mr. Waterman, defendant's manager and superintendent testified, he was mining engineer; belonged to the "Asso-

ciation of American Engineers;" had been since 1896 engaged in practical mining; had loaded shots and put them off. He was then asked the following question by the counsel for the defendant: "Would it be consistent with due care or reasonable care on the part of a miner in loading drill holes, in your experience as a miner, for him to use a stick of powder where the cap had come out of the side of the stick on two occasions before putting it in the drill hole or where the wrapper was torn?" Mr. McPherson for plaintiff: "We object to that for the reason it is called for an opinion from the witness on the very question that is to be submitted by the court to the jury, and for the reason it would be improper for the witness in that way to become dictator to the jury as to what conclusion they should come to on a given state of facts, he should only state what was done, then that is one of the questions of law for the court and for the jury as to what effect that conduct is in law." Haltzen v. Railroad, 140 S. W. 767; Nash v. Dowling, 93 Mo. App. 164; Gutridge v. Railroad, 94 Mo. 472; Rogers v. Rundall, 129 Mo. App. 17; Glassgow v. Railroad, 191 Mo. 358; Taylor v. Railroad, 185 Mo. 255; Boettger v. Iron Co., 136 Mo. 536; Roscoe v. Railroad, 202 Mo. 594. (2) The court erred in giving defendant's instruction "D." Bank v. Westlake, 21 Mo. App. 565; Mansur v. Botts, 80 Mo. 658; Bank v. Murdock, 62 Mo. 70; Wright v. Fonda, 44 Mo. App. 634; Clark v. Hammerle, 27 Mo. 55; Mead v. Brotherton, 30 Mo. 201; Johnson v. LaBarge, 46 Mo. App. 433; Zeis v. Brewing Co., 205 Mo. 638; Cytron v. Transit Co., 205 Mo. 692; Flaherty v. Transit Co., 207 Mo. 318; Chambers v. Chester, 172 Mo. 461; Lore v. Mfg. Co., 160 Mo. 608; Blundell v. Mfg. Co., 189 Mo. 559; Cole v. Transit Co., 183 Mo. 81; Huhn v. Railroad, 92 Mo. 440.

*James A. Potter* and *Edward J. White* for respondent.

(1) Under the allegations of the plaintiff's petition, and the undisputed evidence, the plaintiff's case should not have been submitted to the jury. (a) The injury resulted from an accident, which might have been caused by one of several causes and it devolved upon the plaintiff to prove that the injury resulted from the cause which would render the defendant liable and in failing to do so he failed to prove a cause of action. Thornberry v. Mining Co., 126 Mo. App. 660; Whaley v. Coleman, 113 Mo. App. 594; Caudel v. Kirkbride, 117 Mo. App. 417; Morgan v. Mining Co., 136 Mo. App. 241; Beebe v. Transit Co., 206 Mo. 419; Hill v. Drug Co., 140 Mo. 440; Smith v. Box Co., 193 Mo. 716; Knorpp v. Wagner, 195 Mo. 638; Livengood v. Lead Co., 179 Mo. 229. (b) The plaintiff assumed the risk of loading the drill hole with the charge of dynamite at the time of his injury. He was a skilled man in the service and used the charge of dynamite with knowledge of any defects in the manner in which it was prepared and a full knowledge of the additional dangers likely to result therefrom and in this condition of the employment and with full knowledge of the danger, the plaintiff, as an expert, assumed the risk of any resulting injury. Marshall v. Press Co., 69 Mo. App. 256; Ray v. Power Co., 68 Mo. App. 380; Minnier v. Railroad, 167 Mo. 100; Burning v. Medart, 56 Mo. App. 445; Pulley v. Oil Co., 116 S. W. Rep. 430. (c) In using the stick of dynamite, loaded as the plaintiff testified the stick was prepared at the time of his injury, so that the cap would fall out of the stick of powder, in pushing it down into the drill hole, without assurance of safety and in the absence of any order by any representative of the defendant, the plaintiff was guilty of contributory negligence, such as to defeat his recovery. Cauble v. Kirkbride, 117 Mo. App. 417; Whaley v. Coleman, 113 Mo. App. 599; Thornberry v.

Mining Co., 126 Mo. App. 663; Knorpp v. Wagoner, 195 Mo. 668; Morgan v. Mining Co., 136 Mo. App. 241. (2) The question asked the mining expert, Waterman, as to whether or not it was consistent with due care, for the plaintiff to use the stick of dynamite, when it had been loaded so that the fuse and cap had fallen out of the side of the stick of dynamite twice before he pushed it down into the drill hole, where the drill hole had been drilled into the flint rock, was a proper question: (a) The loading of drill holes with dynamite is not a matter within the common knowledge of mankind and the general public have no opportunity of seeing or knowing anything about the means and manner of loading drill holes in mines and are not familiar with the danger attending such loading or the agencies and appliances used by miners. Such agencies and such tools and appliances are known and understood only by those who have special knowledge and experience regarding this kind of business and this was therefore a proper subject for explanation by expert testimony and the admission of the evidence was proper. Meily v. Railroad, 215 Mo. 590; Spencer v. Bruner, 126 Mo. App. 94; Brands v. Car Co., 213 Mo. 698; Combs v. Const. Co., 205 Mo. 367; Line v. Mason, 67 Mo. App. 279; Obermeyer v. Mfg. Co., 120 Mo. App. 59; Czezewzka v. Railroad, 121 Mo. 201; Monahan v. City, 58 Mo. App. 68; Goins v. Railroad, 47 Mo. App. 173; Boettger v. Scherpe Co., 124 Mo. 87; Benjamin v. Railroad, 50 Mo. App. 602; Johnson v. Railroad, 96 Mo. 340. (b) The plaintiff had been permitted to state his opinion in his case in chief, that he thought that he could, by care, use the stick of dynamite as it was loaded, at the time of his injury. And the evidence of the defendant, that it was not consistent with reasonable care on the part of any miner to use a stick of dynamite, loaded as this was shown to be loaded, met this evidence on the part of the plaintiff and was competent, to meet the evidence thus per-

mitted to be introduced by the plaintiff, over the objections of the defendant, that it was consistent with due care to use such a stick of dynamite. Having thus offered evidence that by reasonable care the plaintiff could have safely used this stick of dynamite as loaded, the plaintiff cannot contend that the defendant committed error in meeting that proof on the part of the plaintiff. Railroad v. Plate, 92 Mo. 614. (3) The defendant's instruction "D" submitted the issues to the jury on the plaintiff's theory of the case, that his injury resulted from the cap coming out through the stick of dynamite and the substitution of a higher grade explosive. Notwithstanding he failed absolutely to prove either of these allegations of negligence, the defendant's instruction submitted the case to the jury on the only theory that he would be entitled to recover under and hence he has no ground for complaint.

LAMM, J.—This is a suit for damages for personal injuries. On August 12, 1907, plaintiff, a drillman employed in defendant's zinc mine near Aurora, was hurt by a premature explosion under ground on a seventy-foot level while loading a drill-hole with a shot. Presently, he sued in the Lawrence Circuit Court, counting on negligence. The jury finding against him and judgment following, he appeals.

Contentions made here in briefs search the pleadings and facts.

*The pleadings.* Charging he was a drill-man running a drilling machine in defendant's mine and loading and firing shots in drill-holes, plaintiff complains in his petition for that (as defendant's servant) he had been for a long time loading drill-holes with giant powder of forty per cent nitroglycerine; that defendant negligently and without notice to him changed the powder to a brand of fifty per cent nitroglycerine; that the fifty per cent sort was more sensitive to explosion, and more powerful than the forty per cent kind, requiring

more care in manipulation (all of which defendant well knew or might have known with due care) ; that a stick of fifty per cent powder was negligently-furnished to him by some of defendant's other servants, which stick had been negligently prepared in that its paper wrapping was broken and torn, and the hole for the fulminating cap was negligently made too big, so that the cap attached to the fuse was liable to fall out, come in contact with the walls of the drill-hole and explode the powder prematurely while loading the hole for firing; that an explosion and his injury happened while plaintiff, in the line of duty and exercising due care, was loading a drill-hole with said stick; and that such explosion and his resulting injuries were caused by said negligent change in powder, negligent failure to notify plaintiff of the change and the negligent way said stick was prepared for use as aforesaid.

The answer was a general denial, a plea of contributory negligence, that the accident was a casualty not to be anticipated and was one of the risks plaintiff assumed when employed as a miner. There is a further averment that the statute making employers of miners responsible to one servant for the negligence of his fellow is unconstitutional—but that feature of the answer is abandoned.

The reply was conventional.

*The facts.* Summarized, the facts follow:

Plaintiff's arm was crushed by a premature explosion of a shot on August 12, 1907, the broken bones did not knit kindly when set, and, at the time of the trial in March, 1908, the arm was in a bad way. The extent of his injuries not being material to any present issue, the testimony in that regard may be omitted.

It is agreed on all sides that plaintiff was a miner of experience, commencing years before as a shoveler, then becoming a pick-hand and a helper at a drill, and finally a drill-man or cutter. That he knew the brands of powder used in mines, the dangers incident to using

high explosives, and was an expert in their use. As drill-man he ran a drilling machine, drilled holes for blasting in mines, loaded and shot his drill-holes, having a helper under him to fetch, carry and help generally. While plaintiff was under a foreman, yet the details of drilling, loading, firing, inspecting his drill-holes and the roof after firing, were entrusted to him as part of his duties. Off and on he had worked for defendant since November, 1904—the last time for a few weeks. Powder is furnished to drill-men in a round form, like exaggerated firecrackers—called sticks. Each "stick" is, say, eight inches long and one inch in diameter. These sticks are stoutly wrapped with paper. A stick equipped with a fulminating cap attached to a fuse is called a "shot." In loading a drill-hole for blasting in a mine, sticks of powder are put to the bottom of the hole, one on top of the other, and the last stick to go in is the shot. These sticks are put in one at a time by a tamping bar. The bar, in this instance, was a gas pipe with a wooden plug in one end (the tamping end) ten or twelve inches long. As we gather, in the end of this plug is a projecting nail. The miner pushes this nail in the stick of powder and lowers it into the hole by the tamping bar. On this occasion, plaintiff, acting as his own boss, had drilled a group of holes and was loading one of them for firing. He had put three sticks in place in the bottom of one of said drill-holes eight feet deep and two inches in diameter, and was putting the fourth, the shot, in place when the whole charge exploded.

A shot is made by punching sideways a hole in a stick of a dimension suitable to hold a fulminating cap in position when inserted—the idea being to carry the loose end of the fuse up and out for firing and thereby explode the cap and charge. In this instance, when about to load the drill-hole with the shot, plaintiff found the cap lying near by and out of the cap hole. Looking into the matter, he saw the hole was too big to

hold the cap in place. Knowing this, he put the cap back in the cap hole and in handling the shot the cap fell out again. Once more he put it back and it again came out presently as he was putting the shot in the drill-hole. He also noticed that the paper wrapping of the stick was torn at the cap hole. He had no knife to make a new cap hole and as he had used a shot of that kind three or four times before in his years of mining experience, he says he thought he could safely do it again. Accordingly, putting the cap back in the cap hole, he pushed the shot four or five feet down the drill-hole with his tamping bar. At that point, while engaged in ramming it home, the powder was touched off in some mysterious way. He did not know the cause of the explosion. Sticks of powder, including the shot, were furnished him shortly before the acci-dent by defendant's foreman, who sent them from the top of the ground to the working level.         •

On defendant's part there was uncontradicted testimony on the cap hole and torn wrapper to the effect that one certain punch was used in making holes for all caps, and that if the hole in this particular shot was too big to retain the cap or the wrapper was torn the foreman who personally made the shot was not aware of it. The tear in the paper was not accounted for unless the speculation is indulged that it came from punching the cap hole. There was also unquestioned proof that if the cap hole was too big to retain the cap, or if the paper was torn so that powder would leak out, then, either increased the danger. This, because the drill-hole was in flint formation and if escaped powder got on its sides through such leak, it might explode in several ways. For instance, a spark from the friction of the iron tamping rod; or a cap loose, out, dangling or pinched, might explode the powder similarly—the very office of the cap being to explode the powder. Plaintiff had made shots himself, knew of all the aforesaid dangers as an expert powder

man, and, without asking for another shot as he might have done, assumed to use the one he knew was in bad condition. He, as said, justified himself in that use by saying that in his several years experience he had done so three or four times safely. There was also cogent and unchallenged testimony that the use of such a defective shot, with a loose cap and torn wrapper, was not proper care on the part of a miner. He might do it three or four times and the fifth result in an explosion from friction against the sides of the drill-hole. Plaintiff knew a jar or spark would explode powder and that light tamping was necessary even when sticks were in perfect condition. In this instance he said he was as careful as he could be—as careful as anybody could be. While there was testimony that sticks of powder with a high percentage of nitroglycerine were more sensitive to explosion than those of less, yet in the case in hand plaintiff said he was as careful as he could have been if there had been seventy-five per cent of nitroglycerine. Recalled to the stand later, he testified that if he had known the shot was Red Cross powder he would not have used it in its then condition, because that brand is more "treacherous" than any other of the same per cent. There was other testimony to the effect that Red Cross powder was more sensitive to explosion than any other in use by Aurora miners.

There was testimony, too, that it was customary for miners to investigate individually the powder they used, the strength of the powder having to do with the amount of work done, and miners look to the strength of the powder and govern themselves accordingly in the use of it. Plaintiff further testified that when he went to work for defendant at the outset the last time of his employment, he looked into the "powder box" (we infer, a box used to store sticks) and discovered the brand in use in the mine to be that known as forty per cent Independent. Powder of that

brand was marked with the letter E; there was another Independent brand marked D having fifty per cent nitroglycerine. In Red Cross powder the per cent is printed on the sticks. Plaintiff did not notice the label or marks on the exploded shot, it might have been Independent, either forty per cent or fifty per cent, he said, for all he knew. By other employees, by the powder dealer and his books, it was shown that the only powder in use by defendant at the time, and that had been used for several weeks before the accident, was the fifty per cent variety, known as Independent D. The record shows that if there was a change in powder plaintiff was not informed of it and he said he knew of no change in point of fact. It further appears that if there was any change in powder from Independent to Red Cross, it was made by the dealer on his own hook and defendant itself was not informed of the fact. However, the dealer who furnished all the powder used by defendant denied any change. Plaintiff had a miner's lamp in his hat and the marks on the sticks of powder were of such sort that he could have discovered a change by looking. There is, as already noticed, a brand of giant powder known as Red Cross used in mining. There was testimony tending to show that Red Cross powder has a peculiar brand on each stick and that it is more powerful than other powders of the same per cent of nitroglycerine, and more sensitive to explosion. The deposition of a miner was read, a fellow workman of plaintiff. He testified that the powder used by plaintiff at the time of the explosion he *thought* was Red Cross. It seems, however, that he did not see the powder actually used by plaintiff and merely *supposed* it was Red Cross. He judged from the powder in use *afterwards*. This witness, testifying in that behalf without regard to dates, said the per cents marked on the powder boxes were forty and fifty, that if defendant ran out of one it used the other,

243 Sup.—24

and that the foreman said they paid the price of fifty per cent powder and got only forty per cent strength. The best we can make out of his testimony is that while he ''thought'' they were using Red Cross at the time, he did not know. He also said that plaintiff could have told the difference between Red Cross and Independent if he had looked at the sticks while handling them. Defendant's foreman, who personally made up the shot in question, testified that Red Cross was not used at the time, but Independent D, the same in use right along. As to Red Cross, plaintiff further testified he had handled it of a fifty per cent grade theretofore in other mines, that he wanted the jury to understand that at the time of the explosion he was as careful as he had been when theretofore he handled fifty per cent Red Cross and was *''just as careful as he could have been''*—as careful as if it had been seventy-five per cent nitroglycerine.

Twice, once at the close of plaintiff's evidence and again at the close of the case, defendant unsuccessfully asked instructions in the nature of demurrers to the evidence.

The questions here are three, viz.: Defendant insists that, on the whole record, plaintiff was not entitled to recover as a matter of law. While for plaintiff error is assigned for that incompetent testimony was admitted and an improper instruction given for defendant.

We are of opinion plaintiff made no case for the jury, hence errors, if any, in admitting testimony or instructing the jury on behalf of defendant, do not materially affect the merits. This, because:

(a) Instructions to the jury or the admission of testimony for defendant touches merely the way the case is put to the jury; hence, when an appealing plaintiff's case is challenged, as here, he must have made a case at the trial to put to the jury before he is heard to complain of the *way* it was put to them. In the prac-

tical administration of justice, it is a plaintiff who has a case, not one who has none, who has a real grievance on bad advice to the jury or on lame proof by his adversary. The logic of the matter, then, is that if on the facts of the record a court can say as a matter of law that the end reached at the trial was the only end that could be rightly reached, plaintiff can not be injured (within the meaning of that word in the law) by improper testimony or too favorable instructions for defendant. When well looked to this doctrine accords with good sense and the intendment of our statutes; for one statute prescribes that error to be reversible in a civil action must affect the *substantial rights of the adverse party* (R. S. 1909, sec. 1850); and another, that reversible error in a civil case is error *materially affecting the merits* (Ibid., sec. 2082). On those two commandments hang a substantial part of the law of appellate duty. Since the law-giver has said in so many words that not all error but only a certain kind is reversible error, it behooves a court whose function it is to enforce the written law between man and man, to see sharply to it that it leads the way by setting a good example in obeying the written law on its own duty. Paul, a sound lawyer, laid that doctrine down on a dramatic occasion—Acts xxxiii:3. In establishing a working theory in the premises, the stiff rule has come to be: No case for plaintiff, no merits or substantial rights. No merits or substantial rights, no reversible error of which plaintiff can complain. That rule is steadily adhered to. [Moore v. Railroad, 176 Mo. l. c. 545; Bradley v. Tea and Coffee Co., 213 Mo. l. c. 325; Mockowik v. Railroad, 196 Mo. l. c. 568; Schuepbach v. Gas Co., 232 Mo. l. c. 611-2; Whalely v. Coleman, 113 Mo. App. l. c. 600.]

(b) The specifications of negligence are two:

First. A negligent change of powder—a change without notice to plaintiff.

Second. A negligent preparation of the "shot."

(1) As to the first, there is a failure of substan-- tial proof. The change is said to be from forty to fifty per cent powder. The proof, as distinguished from conjecture, runs all one way, viz., that plaintiff was using the same kind of powder he had been. True there is a notion indulged by one witness that Red Cross powder was substituted, but, when sifted, his testimony amounts to no more than a supposition—a thought. Suppositions are without legal efficacy. They are fanciful conceits thrown off as freely by the human mind, as are threads for its web by a spider, and about as inconsequent. So, the petition says nothing about Red Cross, a powder earmark hardly escaping the pleader if a fact. We think the notion of substituted Red Cross smacks of makeweight, mere flotsam and jetsam. We lay it out of view.

(2) As to the second, there is some testimony tending to show that when the shot was furnished by the foreman it was in bad condition, i. e., the cap hole was too big for the fulminating cap, and, according to what plaintiff saw, there was a rent in the wrapping of the stick where the cap hole was punched; but whether that rent was there when the shot left the foreman's hands, or came there by some inadvertence in the mine, is left somewhat dark. Those defects self-evidently increased the hazard of loading drill-holes and furnish a likely cause for explosion. If, now, plaintiff had not timely known of the imperfect shot and increased hazard, we would have an entirely different case to deal with. But in point of fact he knew more in that regard than the master. For instance, he knew that particular cap would not stay in that particular hole but would come out in loading. The master did not know that pregnant fact, nor did the servant think worth while to inform him of it. The drill-hole was in flint formation and by pinching or rasping or tamping there might be a spark in loading because of the flint formation. The master knew nothing of that ac-

tual drill-hole.  It would not do to hold that the knowledge of the servant in those particulars should not be reckoned with in determining the liability of the master.

Knowing all these things, this unfortunate plaintiff, without a particle of necessity for doing so, and with a contempt for peril born of working in its ever present shadow, chose to use the imperfect shot when he could have had another for the asking. Wherefore?  There is nothing in the case warranting the conclusion this master expected him to use an imperfect shot.  Observe, too, the plaintiff neither sought nor relied on the master's advice in that behalf.  He trusted to his own judgment.  He knew that using blasting powder was inherently dangerous at all times and at best.  He knew the hazard was two-fold inflamed by using a leaking shot which had a loose cap likely to come in contact with the rough walls of the drill-hole and prematurely explode the charge.  A servant is not a "mere machine."  [Bowen v. Ry. Co., 95 Mo. l. c. 277.]  The master need not either actually or constructively hover over every transaction to keep the servant from hurting himself at his work by an act sounding to folly.  He may rest somewhat on the fact that the servant has eyes, reasoning faculties, experience, knowledge in his trade.  The master pays him to use them all.  So, the servant, in the very act of hiring, agrees that he will.  [Forbes v. Dunnavant, 198 Mo. l. c. 209.]  Mine owners may intrust the details of inspecting drill-holes and the loading and firing of them to drill-men.  [Knorpp v. Wagner, 195 Mo. l. c. 663, and cases cited.]  And when such a servant, in effect his own boss, pro hac vice, knowing the true facts and more than the master knows, voluntarily selects his own course in loading a drill-hole, when other courses are open and when he knows (as this one did) that he took his own life in his hands in the choice he made to confront a known danger, I think there is

neither reason nor authority for putting the responsibility for the to-be-expected result on the master; for that danger was glaring, imminent and such as no reasonably prudent man should take at another's risk—absent a command from the master. When he took it, it was at his own, not at his master's. Whether, then, the doctrine of assumed risks or of contributory negligence be invoked, the result is the same as the law of negligence is now administered in this jurisdiction.

Respondent's counsel cite a line of cases on all-fours, holding there is no legal liability under the facts of this record. They may be looked for in the head-notes of our reporter. We will not swell this opinion by listing them or quoting from them.

In the view announced, errors assigned by appellant are immaterial. Let the judgment be affirmed. It is so ordered. All concur, *Graves, P. J.*, in separate opinion.

## CONCURRING OPINION.

GRAVES, P. J.—I concur in the opinion of our brother in this case, but not because of any special efficacy of the statutes to which reference is made, i. e., Revised Statutes 1909, sections 1850 and 2082. In so far as these sections express the rule of conduct fixed by the courts themselves they are all right, but in so far as they undertake to trespass upon the prerogative of the courts, if they do, they cannot stand. As a matter of fact they do but express the established rules of the courts—rules in existence long before the statutes. I do not object to the rule announced in the statutes, because, as said, such has been the established rule of the courts for a time long antedating these statutes. What I do say is that these statutes, and none other of like tendency, are binding upon the courts. The Constitution of this State has confided the business thereof to three separate and distinct

magistracies, i. e., the Executive, the Legislative and the Judicial. The same instrument prevents one magistracy from interfering with the duties of the other.

The court can not compel legislative bodies to act or keep them from acting. Neither can the Legislature by legislative act stifle the conscience of the courts in the decision of causes. Both are constitutional bodies, and act within their own sphere. The Legislature has no power to interfere with the free and full exercise of the judicial mind in determining a cause committed to the judiciary by the Constitution.

So that I prefer to place my concurrence upon the long established law of the courts, rather than upon the supposed efficacy of these statutes. The statutes are but expressive of this established law of the courts and for that reason perform no function, but to approve of statutes of this character might lead to the enactment of more drastic ones, which would call for the assertion by the court of its constitutional powers. The Legislature cannot directly nor indirectly tell this court how it must decide a case. The conscience of the court cannot be bound by legislative enactment, any more than the Legislature can be forced to act by judicial action. The sooner the respective departments of government recognize the constitutional limitations above mentioned the better it will be for all.