**PHOENIX INSURANCE COMPANY OF HARTFORD, CONNECTICUT, Plaintiff-Appellant,**

v.

**CHRYSLER CORPORATION and William Eddie Reed d/b/a Reed Heating and Air Conditioning, Defendants-Respondents.**

**No. KCD 27071.**

Missouri Court of Appeals, Kansas City District.

Dec. 31, 1975.

Motion for Rehearing and/or Transfer Denied Feb. 9, 1976.

Application to Transfer Denied April 14, 1976.

J. Robert Tull, Mallory V. Mayse, Columbia, for plaintiff-appellant.

J. Turner Jones, George D. Nichols, Columbia, for Reed.

Howard F. Major, David A. Oliver, Roland P. Walker, Columbia, for Chrysler Corp.

Before WASSERSTROM, P. J., and SHANGLER and DIXON, JJ.

DIXON, Judge.

This suit arises out of a fire occurring in a restaurant owned by Arch and Mae E. Pollock. Phoenix paid a portion of the fire loss and upon subrogation brought this action against Chrysler (the manufacturer) and the Reeds (the installers) of a furnace allegedly the causative agency of the fire. The evidence was heard by the court without a jury and, upon a finding for all defendants, Phoenix appeals.

Phoenix contends under three points that the trial court judgment is in error: first, that the trial court erred in its determination that the cause of the fire could not be fixed without resorting to conjecture and speculation; second, that the trial court's finding that there was a failure of proof as to the condition of the maintenance of the furnace was erroneous; and third, that the trial court's finding of a failure of proof as to the installation of the electrical and plumbing connections was error. These points stated above are amplified by Phoenix by reference to certain statements of the trial court in colloquy with counsel upon the motion for new trial raising other questions concerning what Phoenix asserts was the trial court's action in assuming facts not in evidence.

A statement of the principles of review applicable to this appeal will serve to remove from this appeal a variety of the diffused and confusing factual arguments advanced by the parties.

Review here is de novo and if upon the whole record the judgment of the trial court is correct upon any theory, the judgment will be affirmed despite the assignment of possibly erroneous reasons for the judgment advanced by the trial court. *Commercial Union Ins. Co. v. Farmers Mut. Fire Ins. Co.*, 457 S.W.2d 224 (Mo.App.1970); *Dill v. Poindexter Tile Company*, 451 S.W.2d 365 (Mo.App.1970). The judgment of the trial court will not be disturbed unless palpably insufficient. *R. L. S. v. J. E. S.*, 522 S.W.2d 5, 6 (Mo.App.1975). So, too, in this review, the inferences favorable to the prevailing party will be drawn. *City of St. Louis v. Boos*, 503 S.W.2d 133 (Mo.App. 1973).

When considered in the light of these principles, the record supports the following factual statement.

The fire causing the damage occurred in April of 1967. It was discovered by a policeman at about 4:00 in the morning. The location of the fire was limited to an unfinished room in a section of the building where the construction of four additional rooms was underway. The furnace in question was located in that room. The furnace was a downflow type furnace in which the heat flowed under the floor in duct work to the appropriate outlets in the other rooms and the cold air returns were likewise under the floor approaching the furnace from one side and going up at the side of the furnace and in at the top, the blower functioning to pull the air past the heat exchanger and into the hot air runs. The furnace was located close to the east wall of the room and facing north. As noted, the area was in the process of construction, and there is substantial evidence that there was debris on the floor of the room immediately prior to the fire and after the fire and there was evidence that at intervals after the furnace had been lighted the defendant Reed had seen debris in the area and on at least one occasion removed cardboard and other flammable materials from a position in close proximity to the furnace. There is some slight dispute with respect to the time when the furnace was first lighted. Reed testified it was started at the least in early December of the preceding year. The owner's testimony, based upon a hearsay conversation with the manager, indicated it had been "turned on" only the night before the fire. The firemen testified that when they arrived the burners on the furnace were still ignited and burning and that it was necessary to shut off the gas outside the building in order to stop the furnace from further burning.

The physical conditions in the building after the fire were as follows. Immediately west of the furnace there was a hole in the floor of the addition approximately 4 feet by 4 feet. The fire had burned this hole completely through the planking and a 2 x 10 floor joist. The studding on the east wall, the closest wall to the furnace, was charred and burned from a point level with the fan chamber of the furnace up to the rafters and down to within three or four feet of the floor. The roof rafters were charred over an area approximately 5 feet by 7 feet in the immediate area above the furnace. The furnace was not available at the time of trial, having been disposed of some two years after the fire by the contractor who removed it. Pictures were in evidence showing the general condition of the furnace and the area in which it was located. The wiring to the furnace was charred and in one instance burned completely in two, and the furnace itself exhibited heat damage both externally and internally. All the evidence indicated that the furnace was designed with at least three safety controls; one of these is not important in the context of the present litigation, and that is the pilot light which apparently continued to function without difficulty and which was intended only to make sure that no gas escaped into the furnace without being ignited. It is entirely mechanical in operation and does not depend upon the electricity supply.

The other two controls with which the furnace was equipped were electrical controls which operated to control the gas valve permitting gas to reach the burners of the furnace. They can be designated for the purposes of this statement as the upper control and the lower control. The lower control, reacting to heat in the area of the control, activates a mechanism which interrupts the electrical connection if the heat is in excess of 180 degrees. The upper control, operating in a similar fashion, cuts off the electricity when the temperature reaches 145 degrees. Both of these controls operate on the principle that excessive heat exceeding the limit of the switch will interrupt the electrical current connected to the valve and a mechanically activated spring will close the gas valve. It is thus apparent and conceded under the evidence that if the

electrical connections were broken, the normal operation of the gas valve would be to close and thus if the electrical connections were interrupted by an external fire, the valve would mechanically close itself by means of its internal spring loaded mechanism. There was no evidence of any malfunction or improper installation of either of these controls or of the valve itself, and the evidence clearly indicated that the valve was operating properly at the time of the installation, for the serviceman who installed it made tests to determine that the thermostat and the limit controls operated to shut off the gas flow in the presence of excess heat. There was evidence that the furnace cover or door contained a decal or label affixed by glue; and, despite the evidence of great heat in the area of the furnace from either internal or external sources, the decal was not damaged in any way, leading to an inference that that cover may not have been in place at the time of the fire. The evidence is confusing on this issue, but it is possible to infer either that it was not in place or that the firemen removed it subsequent to the fire.

What has been stated thus far is the only evidence not based upon opinions and conclusions of the witnesses. As might be expected, contrary conclusions with respect to the cause of the fire were drawn by the various witnesses in the suit, the witnesses for Phoenix attributing the cause of the fire to overheating in the furnace and relying upon the evidence of discoloration of the internal furnace parts and evidence of fire in portions of the furnace where such fire would not ordinarily occur. Reed, in his testimony, concluded otherwise, and the fire department personnel who testified stated that in their opinion the cause of the fire was an overheated furnace, but admitted the possibility that the fire could have commenced or been started by the untidy housekeeping and debris in the area of the furnace, a possibility supported by the large hole in the floor adjacent to the furnace.

The expert testimony in the case boiled down to the conclusion by both the Phoenix and the Chrysler experts that the only way the furnace could have continued to burn as the firemen testified, coupled with the undisputed fact that the wiring was burned and charred, was that the valve did not properly close and from this the deduction that some physical intervention occurred to prevent the valve from properly closing.

Neither the Phoenix expert nor any of the other witnesses testified to any pattern of occurrence of such mechanical failure of a valve and, in fact, the furnace installation experts had never seen the occurrence of such a mechanical failure of a valve in the presence of foreign material. Curiously enough, the evidence does not exclude by specific mention the possibility of the valve in question being operated manually to permit the flow of gas without the intervention of the electrical controls, and the assumption underlies all of the testimony that the furnace was, in fact, operating under the restraint of the automatic controls prior to the fire. There is no evidence of any dismantling of the gas valve nor of an examination of it by anyone to establish upon visual inspection whether or not the valve had, in fact, failed to close by reason of the introduction of a foreign substance which was the only factor the experts agreed could have caused the valve to remain open when the electrical current was interrupted. Other necessary references to the testimony will be made in the treatment of the points raised.

The points raised by Phoenix on this appeal can be resolved if there is any basis upon which the trial court judgment can be sustained.

With that principle in mind, a closer review of the evidence with respect to the cause of the fire will demonstrate that the trial court's judgment is not in error. As previously noted, there is no direct evidence concerning the cause of the fire. The direct evidence in the case clearly gives rise to at least two inferences and possibly three as to the cause of the fire. The first inference and the one which Phoenix asserts is the more "reasonable probable cause" is that,

first, the gas valve failed to close by reason of some mechanical obstruction. Then the gas furnace continued to run despite the presence of enough heat to normally cause it to cease running, thereby overheating the furnace and ultimately igniting the building. Diametrically opposed is the inference, based upon direct evidence of the presence of debris around the furnace, that highly flammable material came in contact with the normal heat of the furnace, became ignited, started a floor fire which thereupon spread to the roof and adjacent walls. A third possible cause is the inference which arises from the physical facts which indicate the furnace may have been tampered with by some of the workmen, this because, despite the intense heat in the area of the decal on the furnace, it had not been damaged, giving rise to an inference that it was not in place when the fire started. This inference is, in fact, assisted by the testimony of Phoenix's expert who stoutly insisted that something had burned in the fan chamber of the furnace where no combustible materials ordinarily would be and which he insisted could not have occurred by the burning of the electrical wires and filter materials normally present in that fan chamber. His testimony indicated that temperatures in the range of 1,000 degrees to 3,000 degrees existed in the fan chamber blistering only the top portion of it, but the photographic evidence and the testimony of those who observed the furnace showed no course of radiated heat from the combustion chamber of the furnace to the fan chamber of the furnace. Thus, Phoenix's expert's testimony concerning the existence of extremely high heat in the fan chamber of the furnace is at war with and inconsistent with his premise that that heat originated from the continuous burning of the flame from the gas burner located at the bottom of the furnace and radiating upward through the metal portion of the furnace to the top and thereby igniting the walls or ceiling. Thus, the trial court was confronted with contrary inferences from the evidence, and the opinion testimony of the Phoenix expert does not afford a clear and convincing theory of causation inconsistent with other possible causes of the fire. The Phoenix expert clearly and unequivocally testified to the presence of intense heat in the fan chamber of the furnace so intense that he characterized it as close to the heat of flame or at the heat of flame, and his testimony likewise clearly establishes his opinion that the gas valve was in some fashion permitted to remain open and the burners of the furnace operated without controls. His testimony, however, does not in any fashion, opinion or otherwise, demonstrate how the continued burning of the burners of the furnace could have created the intense heat he declared was existent in the fan chamber. On cross examination, the Phoenix expert was questioned extensively as to the source of the extremely high heat he testified occurred in the fan chamber. A portion of his testimony will demonstrate the failure of proof as to the cause of the intense heat in the fan portion of the furnace:

"A. I wasn't there. There was evidence that there was heat from the inside of the furnace from the paint patterns, especially in the fan chamber where the charred material was found. There is a definite pattern that follows the shape of the chamber, so I concluded from that that the heat or whatever did this, did it from the inside out. I couldn't conceive of a way, for instance, on the right-hand side of the furnace, how the heat could have come up there and concentrated itself into a rectangular pattern with no smoke evidence.

Q. But the wiring and combustibles in the top of the furnace alone would not create that much heat; is that correct?

A. Maybe not, maybe there was some gas up there burning, too. I think the firemen said it was blazing merrily away. I don't know what was blazing but something was.

Q. Assume the firemen said there was a medium flame in the bottom of the furnace, said there was no fire coming out the front.

A. I am saying what could be up there; what was up there, I don't know.

Q. Assume that fact.

A. Other than material in the filter, the wire or gas coming up there and burning, I don't know.

Q. You're saying there would have to be fire up in the top to create that heat; right?

A. Yes, yes."

He was then asked to assume that the furnace was operating normally with a medium flame and to give any reason, if there was one, why there would be more intense heat in the top of the furnace. His response was that he knew of no reason for such a condition. Following this testimony, the court then, obviously concerned about the cause of the intense heat testified to by the expert as occurring in the upper portion of the fan chamber, questioned the expert himself concerning the possibility of the heat buildup in the burner portion of the furnace as follows:

"THE COURT: Assume for a moment there was nothing in that fan blower chamber except what was supposed to be there, the fan and the—whatever—filters are supposed to be in that area. Could the heat build up in the burner chamber sufficiently and rise into that chamber to cause the type of heat you found?

A. Not by direct path because we have the heat exchanger in between. The only openings, semi-openings were in the front section. These were—there are no combustible material there except this wire which was on the left-hand side.

THE COURT: In your opinion would that wire be sufficient to cause the heat you found?

A. No, it was only strong enough to burn a charred pattern on the outside, on the left-hand side. What happened upstairs was something else again other than just burning insulation."

Clearly, this testimony by Phoenix's own expert left open for inferential determination the question as to the cause of the intense heat in the fan portion of the furnace.

◼ The trial court, confronted with this evidence, necessarily had to select the inference to be drawn. Clearly, Phoenix had the burden to *persuade* the trial court of the validity of its theory of the evidence and the inferences therefrom. This Phoenix failed to accomplish. The trial court had a right to accept or reject all or any part of the expert's opinion based upon the totality of his evidence. The unsatisfactory responses of the expert as to the *source* of the intense heat in the fan chamber may have led the trial judge to conclude that other portions of his testimony were not persuasive or compelling and that Phoenix's proof failed to provide a basis for the essential inference that the overheating was caused by a defective furnace.

◼ Moreover, the fact that the trial court referred to the necessity for resorting to speculation and conjecture supports the finding of the trial court, everything else aside. If the proof offered must depend upon speculation and conjecture, then a verdict based upon such proof cannot stand. In *Bowers v. Columbia Terminals Co.*, 213 S.W.2d 663 (Mo.App.1948), this fundamental principle was recognized and explicated. In that case, in considering a jury finding for plaintiff, the court found that the evidence was insufficient to avoid speculation and conjecture as to the causal connection between the negligence of defendant and the injury to plaintiff.

The rule and supporting authority appear in the following quotation (213 S.W.2d at 670):

"While it is not the rule in this state that for a conclusion to be supported by

**480**

circumstantial evidence, the proof must rise to a degree of certainty which will actually exclude every other reasonable conclusion but the one desired, it is nevertheless held that the proof should have such a tendency, since the force and effect of circumstantial evidence depend upon its incapability of explanation or solution upon any other supposition than that of the truth of the fact which it is adduced to prove. *Fritz v. St. Louis, I. M. & S. R. Co.*, 243 Mo. 62, 148 S.W. 74; *Bates v. Brown Shoe Co.*, supra [342 Mo. 411, 116 S.W.2d 31]; *Wise v. Standard Oil Co.*, Mo.App., 198 S.W.2d 1014. But even though it is not enough to defeat recovery that the circumstances may support inconsistent conclusions of variable probability, if the facts proved by the party having the burden of proof give no more than an equal basis for two or more inconsistent conclusions as to the existence of an essential fact, such party has in that event failed to remove the case beyond the realm of speculation and conjecture, and the facts essential to his recovery are not established by legitimate proof. *Draper v. Louisville & N. R. Co.*, 348 Mo. 886, 156 S.W.2d 626; *Lappin v. Prebe*, supra [345 Mo. 68, 131 S.W.2d 511]; *Muesenfechter v. St. Louis Car Co.*, Mo.App., 139 S.W.2d 1102; *Pape v. Aetna Casualty & Surety Co.*, Mo.App., 150 S.W.2d 569."

■ On the facts of the instant case, to infer that the fire was caused by an overheated condition of the furnace, however that overheating was caused, would require ignoring the inference and the evidence supporting it, that flammable material and debris were in close enough proximity to the furnace to have been ignited by the furnace's normal operation. Viewing the trial court's judgment and the evidence in the light of these principles, the judgment cannot be held erroneous.

Affirmed.

All concur.