C____ L____ R____,
Petitioner-Respondent,

v.

L____ B____ R____,
Respondent-Appellant.

No. 10224.

Missouri Court of Appeals,
Springfield District.

Aug. 16, 1977.

Charles C. Shafer, Jr., P. C., by Jerry Kenter, Kansas City, for respondent-appellant.

William Icenogle, Camdenton, for petitioner-respondent.

STONE, Judge.

In this litigation instituted in November 1973 as an action for divorce but on January 1, 1974, transmogrified into a proceeding for dissolution of marriage [§ 452.-415(2); *In re Marriage of Dodd*, 532 S.W.2d 885, 886(1) (Mo.App.1976)], Lois, defendant in the action for divorce, brings the case here as appellant, and Charles, who initiated the action for divorce, is respondent here. [All statutory references are to RSMo Supp. 1975; 24 V.A.M.S. (1977).] A brief factual review is necessary for an understanding of (a) Lois' single appellate

complaint bearing upon division of the marital property and (b) our disposition of the appeal.

While living in Independence, Missouri, and employed in a nearby industrial plant, Charles met Lois. Each had been theretofore twice married and divorced, and each had children by those former marriages. The transcript picks up the relationship of Charles and Lois when he "moved in" with her and they lived together for an undisclosed period before they were married in Oklahoma on April 11, 1967.[1]

The hapless path that this marital venture was destined to follow to a disastrous end was forecast within the first year or so when, on account of domestic difficulties, Lois twice left home for two-month visits with a sister in Georgia. In fact, the record before us reflects a continuing and exacerbating marital course of crimination and recrimination, charge and countercharge, admittedly accompanied and accentuated on the part of *plaintiff husband* by the liberal and unrestrained use of vile names and filthy epithets (as he readily conceded) addressed to both his wife and his stepson, Mike, and on the part of *defendant wife* (so the transcript indicates) by her frequent descent to a gutter level of name-calling. Since a detailed recitation of the numerous episodes, outbursts, paroxysms and tantrums reflected in the transcript would neither aid in proper determination of this appeal nor make any contribution to the law or literature, we simply record without elaboration the fact of their occurrence as reflecting the conduct of the parties during the marriage, that being one of the four factors which courts are specifically directed to consider in the division of marital property. § 452.330, subsec. 1(4); *Conrad v. Bowers*, 533 S.W.2d 614, 620(6) (Mo.App. 1975).

However, notwithstanding the numerous indignities which each visited on the other throughout the duration of the marriage and the frequent periods of separation following stormy scenes in which the parties would vent their spleen on each other, the final separation did not come until September 25, 1973. When on that date, in another of their oft-recurring domestic donnybrooks Charles allegedly began to cuff her around and told her to get out, Lois retaliated by shooting and wounding him. The record does not disclose what area of Charles' anatomy was violated by the bullet, but we are apprised that the resulting injury sent Charles to the hospital for eleven days. The next day after this final brouhaha Lois, accompanied by Mike, left the family home for the last time. Subsequently, Lois was charged with some criminal offense (not here specified) but acquitted on her theory of self-defense.

Although the record does not reveal the exact age of either party, we are informed that sometime during the four-year period from 1967 to 1971 Charles retired at his place of employment and thereafter drew two checks each month, to-wit, a $158.80 "pension" check from his employer and a $199 social security check, which indicates that he probably reached the age of 65 years during that period. From all of the circumstances disclosed in the transcript, including the fact that her son Mike was only 18 years of age at the time of trial in November 1975 and the fact that she then was employed at $700 per month in a responsible position, we think it fairly inferable that Lois is substantially younger than Charles. Although Lois had received no governmental checks or benefits for herself, after Mike's father died in July 1968 she "drew $138 per month from social security . . . because of Michael."

In 1971, the home base of the principals in this running marital feud had moved, under circumstances shortly to be noted, from Jackson County to the house on a rough 60-acre Ozark hill country tract (the

---

1. Mike S——, then 10 years of age, who was Lois' son by her second marriage, remembered this and so stated at the trial some eight years later, and Lois likewise testified upon cross-examination. After his mother's marriage to Charles, Mike lived with his natural father until the latter's death in July 1968, after which he made his abode with Charles and Lois until their final separation.

farm), of which only 20 to 25 acres were "open land," and to which the real estate broker-witness for Lois euphemistically referred as a "semi-retirement farm." [2]

Upon the death of their father in 1968, Charles and each of his four siblings acquired by descent an undivided one-fifth interest in the farm. In 1971, Charles purchased all of his siblings' interests in the farm. Since this transaction was made on the basis of a then market value of $7,000 for the farm, the aggregate cost of the undivided one-fifth interests of the four siblings was $5,600. "[C]losing costs" imposed on Charles increased the amount required of him to $5,950, which was raised (a) by borrowing $5,250 from a bank in the nearby village upon a note signed by both Charles and Lois and secured by a deed of trust on the farm, title to which was taken in the mortgagors' joint names, and (b) by borrowing $700 from "Mike's money" held by Lois.

The real estate broker-witness for Lois at the trial of this case in 1975 was the broker who in 1971 had represented Charles' siblings and in that capacity presumably had acted in good faith and had exercised his best judgment in negotiating the sale of their undivided interests in the farm to Charles based on a then market value of $7,000 for the farm. However, upon trial this broker-witness declared that "I felt that *we* sold [the farm] below its market value at that time [in 1971]" and "I thought the property should have sold for ten to eleven thousand dollars . . . ." (Emphasis ours)

After finding that the marriage was "irretrievably broken," the court made, inter alia, these additional findings and decretal provisions:

(1) A finding that Charles owned an undivided 20% interest in the farm which he had inherited from his father and that said 20% interest was not marital property.

(2) A finding that Charles owned an undivided 36% interest in the farm "which he received as a gift from his brothers and sisters" and was not marital property.

(3) A finding that the remaining 44% interest in the farm was marital property.

(4) Decretal provisions awarding to Charles the farm and the "household goods and furniture" in the house on that farm.

(5) A decretal provision ordering Charles to assume the indebtedness to the bank secured by deed of trust on the farm and to hold Lois harmless from any liability therefor.

(6) A decretal provision that Charles pay Lois $3,800 (a) as payment for her interest in the farm and in "items" of used furniture in the house and (b) as reimbursement of the $700 advanced by Lois from Mike's funds when the undivided interests of Charles' siblings were purchased. If Charles could not raise $3,800 to make the decreed payment within 45 days, upon his application the court would make such further orders "as necessary to arrange for the payment of said money by decreeing the terms of a promissory note and [second] deed of trust" on the farm.

Although the reasoning by which the trial court arrived at the percentages in findings (2) and (3), supra, was not enucleated by the trial court in the "Judgment Entry" or elsewhere in the record, the explanation appears to be that the *difference* between (a) the higher figure of $11,000 in the "thought" of Lois' real estate broker-witness that "the property should have sold for ten or eleven thousand dollars" and (b) the agreed market value of $7,000 on which the sale of the siblings' undivided interests to Charles was made in 1971, was $4,000 or approximately 36% of $11,000.

**2.** From the official state highway map, we know judicially that this tract is located some six miles from the nearest village [*In re Village of Lone Jack*, 419 S.W.2d 87, 91(6) (Mo. banc 1967); *Walsh v. Table Rock Asphalt Construction Co.*, 522 S.W.2d 116, 118(1) (Mo.App. 1975)]; and, as we are permitted to do, from the 1970 United States decennial census report we glean the information that this village was then populated with 106 souls. *Varble v. Whitecotton*, 354 Mo. 570, 575, 190 S.W.2d 244, 246(4) (banc 1945); *Moulder v. Webb*, 527 S.W.2d 417, 419(4) (Mo.App.1975).

The sole "Point Relied On" in appellant Lois' brief is that "[t]he trial court erred in awarding the respondent [Charles] an undivided 36% interest in the family farm as a gift from his family because the family farm was purchased subsequent to the marriage with the title in the joint names of husband and wife." Since our appellate review is limited to those issues presented and preserved in "Points Relied On," we attend only that quoted complaint. *Pruellage v. DeSeaton Corp.*, 380 S.W.2d 403, 405(3) (Mo.1964); *Ledbetter v. Ledbetter*, 547 S.W.2d 214(1) (Mo.App.1977); *Freshour v. Schuerenberg*, 495 S.W.2d 116, 118(2) (Mo.App.1973); *Del Monte Corp. v. Stark & Son Wholesale, Inc.*, 474 S.W.2d 854, 857(2) (Mo.App.1971).

Consideration of the facts presented in the transcript and review of appellant's authorities constrain the conclusion that the afore-mentioned point is well-taken. However, in our view of the case we need not and accordingly do not engage in a protracted discussion of either the facts or the law bearing upon appellant Lois' complaint anent the improper characterization or categorization of an undivided 36% interest in the farm as non-marital property.

■ In appellate review of this court-tried case, our concern is whether or not the trial court reached a correct result and not in determining what reasons may have guided the court to its judgment. *State ex rel. Patterson v. Tucker*, 519 S.W.2d 22, 24(1) (Mo.App.1975); *State ex rel. Pope v. Lisle*, 469 S.W.2d 841, 842(1) (Mo.App.1971). Even though based on an incorrect theory, the judgment nisi should be affirmed if, on the evidence, such result properly could have been reached. *Ehrle v. Bank Bldg. & Equipment Corp. of America*, 530 S.W.2d 482, 490–491(7) (Mo.App.1975); *Godsy v. Godsy*, 504 S.W.2d 209, 211(1) (Mo.App. 1973). Otherwise put, the judgment nisi should be affirmed on appellate review if it reasonably can be sustained. *Simpson v. Spellman*, 522 S.W.2d 615, 617(1) (Mo.App. 1975); *Stallman v. Hill*, 510 S.W.2d 796, 798(3) (Mo.App.1974). See also *Edgar v. Fitzpatrick*, 377 S.W.2d 314, 318(12) (Mo.

banc 1964); *Producers Produce Co. v. Industrial Commission of Missouri*, 365 Mo. 996, 291 S.W.2d 166, 170(1) (Mo. banc 1956); *Drydale v. Kiser*, 413 S.W.2d 506, 507(2) (Mo.1967); *Guild Management Co. v. Oxenhandler*, 541 S.W.2d 687, 691(3) (Mo.App. 1976); *Phoenix Ins. Co. of Hartford v. Chrysler Corp.*, 534 S.W.2d 474, 475(1) (Mo. App.1976).

■ On the record before us, we are satisfied that the trial court arrived at a correct result which appropriately could have been reached even if an undivided 36% interest in the farm had *not* been misclassified as Charles' separate property by gift from his siblings and even if the entire undivided 80% interest acquired from Charles' siblings had been properly declared to have been marital property.

■ In reaching this conclusion, we have been cognizant that § 452.330 does not require an equal division of marital property but does contemplate and call for a fair and equitable distribution of those assets [*Marriage of Schulte*, 546 S.W.2d 41, 46(3) (Mo. App.1977); *Seiner v. Seiner*, 552 S.W.2d 54, 55(1) (Mo.App.1977); *In re Marriage of Cornell*, 550 S.W.2d 823, 826(2) (Mo.App.1977); *In re Marriage of Harkins*, 548 S.W.2d 583, 584(1) (Mo.App.1977)]; and, whether or not the decree nisi made such fair and equitable distribution has been reviewed here (as presumably it was considered in the trial court) in the light of the four nonexclusive factors listed in § 452.330, subsec. 1.

■ The judgment of the Circuit Court should be and hereby is affirmed in all respects, *excepting only* as to the findings (a) "that in addition, Petitioner owns an undivided 36% interest in said real estate [the farm] which he received as a gift from his brothers and sisters and said 36% interest is not marital property" and (b) "that the remaining 44% interest in and to said real estate is considered as marital property," which should be and hereby are set aside and for naught held, and the cause is remanded to the Circuit Court with directions to set aside the "Judgment Entry" of November 12, 1975, and to reenter such

"Judgment Entry" as amended (1) by deletion of the above-quoted finding (a), and (2) by reentry of finding (b) in the same language excepting only substitution of "the remaining 80% interest" for "the remaining 44% interest." It is so ordered.

BILLINGS, C. J., and HOGAN, TITUS and FLANIGAN, JJ., concur.