**FIRST FLORIDA BUILDING, INC., a corporation, Plaintiff-Appellant,**

v.

**SAFARI SYSTEMS, INC., a corporation, Safari Inc., Columbia, a Limited Partnership, Larry M. Woods, and Legal Holder of Note Secured by Deed of Trust recorded in Book 406, Page 483, Deed of Trust Records, Boone County, Missouri, Defendants-Respondents.**

No. KCD 29353.

Missouri Court of Appeals, Kansas City District.

July 31, 1978.

Patrick J. Eng, Welliver, Atkinson &
Eng, Columbia, for plaintiff-appellant.

Larry M. Woods, Sapp, Woods & Orr,
Columbia, for defendants-respondents, Lar-
ry Woods and First Bank of Commerce.

Before SHANGLER, P. J., SWOFFORD,
C. J., and WASSERSTROM, J.

WASSERSTROM, Judge.

The question for determination is wheth-
er plaintiff First Florida Building, Inc. is
entitled to a mechanic's lien. The trial
court held no, and First Florida appeals.

In the early 1970s, Safari Systems, Inc.
was engaged in building and operating
automobile trailer camp grounds in various
locations throughout the United States. In
1972 it decided to build and install such a
unit near Columbia, Missouri, on a 200 acre
tract on which there stood a preexisting
camp ground which covered approximately
20 to 30 acres. Safari had been contracting
with First Florida for the erection of simi-
lar camp grounds elsewhere, and in Octo-
ber, 1972, Safari entered into a contract
with First Florida for the building of the
Boone County, Missouri unit. That original
contract provided for First Florida to be
paid the cost of the work performed plus
10% as its contractor's fee. Article 6.2 fur-
ther provided that: "The maximum cost to
the Owner, including the Cost of the Work
and the Contractor's Fee, is guaranteed not
to exceed the sum of ONE HUNDRED
THIRTY THOUSAND & no/100 DOL-
LARS ($130,000.00); such Guaranteed Max-
imum Cost shall be increased or decreased
for Changes in the Work . . ."

Article 7.1 further provided: "Should the
cost of the work performed plus the ten
percent (10%) fee exceed the guaranteed
maximum price as adjusted by Change Or-
ders, the Contractor shall be paid only the
adjusted guaranteed maximum price."

In March, 1973, the parties agreed to an
expansion of the contract to cover addition-

al work including the remodeling of existing facilities. This additional work was authorized by letter agreement dated March 7, 1973, which provided: "It is understood that additional work should be performed on a cost plus 10% basis, and that the ceiling price of the contract shall be raised to $190,000.00."

All of the work to be done by it was completed by First Florida in June, 1973. By that time Safari had paid $132,000, but it was in financial difficulties and unable to pay the balance due First Florida. The parties therefore entered into an agreement for extension of the time for payment. While the parties were still proceeding under that extension agreement, the statutory deadline for First Florida to file a mechanic's lien came up, and on December 6, 1973, it did file its mechanic's lien.

Thereafter Safari paid an additional $19,-912.52. However it then became insolvent and ultimately went through bankruptcy. The final balance left due as claimed by First Florida was $42,350.76, for which First Florida filed timely suit on May 29, 1974.

At the trial, Safari defaulted and the court entered a money judgment against it as prayed. The other parties proceeded to trial, at the conclusion of which the trial court filed a memorandum opinion finding: "The Court cannot with any degree of certainty, from the evidence adduced, determine those matters which are properly lienable from those which are not. Accordingly, judgment for defendants and against plaintiff on mechanics lien."

On this appeal, First Florida relies on the following points: 1) that the trial court made insufficient findings of fact; 2) that the court erred in finding that First Florida had not filed a just and true account; and 3) that the court erred in failing to find that First Florida had a right to allocate the final $19,912.52 paid by it to cover and thereby eliminate nonlienable items. Each of those points will be discussed in turn and

shown to be without merit. Further, respondents argue additional points for affirmance, one of which will be discussed in Section IV below.

## I.

### Sufficiency of the Findings

■ First Florida takes exception to the court's failure to make findings of fact although allegedly requested by counsel to do so. The record fails to support First Florida's assertion that it made such a request. The transcript shows only that: "Plaintiff files Request for Opinion." Rule 73.01–1(b) provides that in a court tried case, the court shall file a brief opinion containing the grounds of decision if so requested by any party and shall, *if requested by counsel,* include finding "on such controverted fact issues *as have been specified by counsel"* (emphasis added). Counsel here requested an opinion and the court complied. Counsel did not specify any controverted fact issues upon which it requested findings, and the trial court cannot be charged with error for not making findings which were not requested.

Moreover, even if a request for specified findings had been made, a failure to comply would not constitute reversible error, and all fact issues would be considered as having been found in accordance with the result reached. *P.I.C. Leasing, Inc. v. Roy A. Scheperle Const. Co., Inc.,* 489 S.W.2d 219, 222[7] (Mo.App.1972). See also *Hahn v. Hahn,* 569 S.W.2d 775 (Mo.App. 1978).

## II.

### Sufficiency of the Statement of Account

Section 429.080 (all statutory references are to RSMo 1969) provides that in order to obtain a mechanic's lien, the original contractor must within six months after completion of the work file with the clerk of the circuit court "a just and true account" of the demand due him. A failure to comply with this requirement calls for the vitia-

tion of the entire lien unless the error is a "result of honest mistake or inadvertence without intent to defraud and if the non-lienable can be separated from the lienable items." *Sears, Roebuck & Co. v. Seven Palms Motor Inn,* 530 S.W.2d 695 (Mo. banc 1975).

First Florida admits that it made some errors in its statement of account filed December 6, 1973, but it contends that these admitted errors and any others which it may have committed were inadvertent and separable within the meaning of the rule last above quoted. It therefore contends that, contrary to the ruling of the trial court, a lien should have been allowed in its favor in a corrected amount.

Respondents have cited 19 alleged errors in First Florida's statement of account which respondents argue are inconsistent with good faith on the part of First Florida and also present a situation in which non-lienable amounts cannot be separated from lienable items. Of those 19 alleged errors, First Florida conceded three at the time of trial. These mistakes related to $150 for trailer rental, $148.20 for a supervisor's expense and $139.03 overstatement of payroll taxes. If these three items represented the full extent of what was involved, those errors could be treated as inadvertent mistakes readily separable and could be deducted from the amount due without vitiating the entire claim of lien. However, these three errors are far from all.

At the close of trial, First Florida filed a reply brief in which it conceded two more errors in its account. The first of these is a small item, $161.15 for a saw which First Florida included in its account on the theory that the saw was consumed in the course of the job. First Florida in its after trial brief conceded that the saw was not so consumed, and it agreed that this item should properly be deleted from the account. This error is quite minor and could also be treated as inadvertent error of a separable item similar in nature to the first three errors already discussed.

■ The second error conceded by First Florida in its after trial brief stands on a different footing. This second item relates to the cost of an office located on land leased by Safari outside of (although near) the 200 acre tract owned by it. In its after trial brief, First Florida admitted that it cannot claim a lien with respect to improvements on land never owned by Safari; but it offered by way of excuse that it did not have reason to suspect the true state of facts until about four months before trial and that the full facts were not developed in this respect until the evidence at trial. Inasmuch as First Florida by its own admission did have some reason to suspect the true facts at least for four months before trial, and since all the pertinent facts were readily available to it at all times, it is difficult to pass off this error as mere good faith inadvertence. Even accepting First Florida's claim of good faith in this regard, this item presents the insuperable objection that the amount of labor and material expended on the off-site office is not clearly established as to amount. Collins, First Florida's manager in charge of accounting functions, admitted in his testimony that First Florida had no record reflecting the costs of constructing or improving that office. The evidence which was introduced concerning those costs were mere loose estimates ranging from $2,000 to $5,000. First Florida, as lien claimant, had the burden of proving the amount of this item as well as all others included in its statement. *Bremer v. Mohr,* 478 S.W.2d 14 (Mo.App.1972). Its offer of mere estimates as to this item could be accepted or not according to the judgment and discretion of the fact finder, in this case the trial judge. The conclusion by the trial court that the varying estimates did not establish this item "with any degree of certainty" cannot be successfully challenged.

Of the remaining items of which complaint is made by respondents, it will be sufficient to discuss only two. The first of these is the item of so-called "extras." In the mechanic's lien statement filed December 6, 1973, First Florida set forth the total amount due to it, before credits for partial payments, as follows:

"10–16–72 Contract calling for total amount due, plus extras    $190,000.00

Extras    4,263.28

See attached computer read-out described as Exhibit A for detailed Job Cost Report.

Total Debits    $194,263.28"

The same figures were repeated in the petition filed to initiate this suit on May 29, 1974.

Counsel for respondents attempted to explore this item of extras with Miller, First Florida's President, but Miller disclaimed any knowledge with respect to it and referred the matter to Collins for answer. Counsel also attempted to explore this question with Sands, the superintendent for First Florida on this job, but Sands also disclaimed knowledge and he also referred the question to Collins, whom he said should have the answer. When Collins' turn to testify came, counsel again went into the question with him.

Collins' testimony with respect to this item is very unsatisfactory. His testimony on cross-examination concerning this matter is as follows:

"Q.  What about the extras in this case? You have I believe in your suit four thousand some odd dollars in extras. Well, I'll go through these exhibits here.

A.  You can't tell it from there.

Q.  Can I tell where the extras are?

A.  Not overall cost.

Q.  Can you tell me how you picked out the extras or who did?

A.  I didn't negotiate the change orders, I don't know. All I know is that we had a cost-plus with a upset, contract.

Q.  With what?

A.  An up-set, limited amount.

Q.  Okay.

A.  Now, how they arrived at that particular $4,000, I can't say. I have a good idea how it was arrived at but I can't verify it.

Q.  Who's "they"?

A.  Whoever prepared the change orders. That was not my function.

Q.  Are you saying that the $4,000 in extras claimed are a result of change orders?

A.  Have to be."

As specifically stated in that testimony, Collins recognized that there was an up-set or top limit to the amount of which Safari was to be obligated. This was further and even more expressly acknowledged by Collins as follows: "Q. You will agree that the contract with Safari has an upper limit of $190,000? A. Yes, sir."

When pressed further to explain how the figure for extras was arrived at, Collins gave the following murky response:

"A.  To my knowledge, no one pulled any figures out. We had a contract on a cost-plus. We had charges that had come through approximating these costs, so we raised the limit of the contract to cover these two. We, in addition, had a letter which I consider a change order from the accounting viewpoint on corporate stationery with the corporate president authorizing the contract value. So that kept increasing the contract. Now, that letter was some lengthly [sic] period, several weeks before the job was finally closed and consummated and all the invoices in. And I better not say it because I am only going by recollections of conversations. So the $4,000 cost in my recollection, that we hadn't been paid so we assumed then that all bets were off, the up-set is gone and we'll just bill on a straight cost-plus basis because we have invested the money and we have not been paid for the job."

Collins' quoted testimony is confusing to say the least. A fair interpretation seems to be that Collins assumed that when Safari failed to pay the full maximum price when that became due, then "all bets were off, the up-set is gone" and First Florida became entitled to disregard the contract term setting a maximum limit of $190,000.

If First Florida were now attempting to urge such a position, the contention would have to be rejected.

But First Florida does not attempt to stand on the ground chosen by Collins. Ignoring the language of its lien statement claiming this $4,263.28 as "extras", and ignoring the like language of its petition, and completely walking away from the testimony by Collins, First Florida now takes the position that the $4,263.28 was not for extras at all. Its new position is set forth in its brief in this court as follows: "There is no charge for extras listed in appellant's mechanic's lien statement. $4,263.28 for extras is arrived at by taking the total amount of job cost and tacking on the 10%. With such 10% comes to $194,263.28."

First Florida's present position on this item is equally as indefensible as that given by Collins. Even overlooking the fact that this new position is at variance with the wording of the lien claim and petition, the present claim is vulnerable to two unanswerable objections. First, the basic contract of October 16, 1972, and the letter amendment of March 7, 1973, are susceptible of no other construction than that the ceiling price of the contract, including the 10% contractor's fee, was not to exceed $190,000. First Florida's present contention flies directly in the face of that contractual limitation. Second, if the 10% add-on were permissible over and above the $190,000, that percentage would have to have some cost basis against which to be applied. The cost basis indicated by the lien statement and the petition is $190,000. If the claim of 10% is applied against that cost figure, the result is an add-on of $19,000 rather than $4,263.28. Thus the $4,263.28 figure is left hanging loose in a void, entirely an enigma.

Possibly the inclusion of this item may have originated as a good faith mistake (even though Collins' testimony tends to indicate a deliberate determination by First Florida to disregard and violate the contractual terms). Even so, the error should have been corrected as soon as it became apparent. *Putnam v. Heathman*, 367 S.W.2d 823 (Mo.App.1963). Here the error became quite apparent from the testimony given at trial. Yet First Florida did not even then concede the error, but instead persisted even to the extent of disregarding the testimony of its own accounting manager and coming up with a new explanation which is at least equally fallacious. Here, as in *Putnam*, First Florida continues with its untenable contention to the very hour of determination on appeal. For the same reason that innocent motives were not found in *Putnam*, so also they should not be found here.

There remains for discussion still another important error in the First Florida account. In the cost of the job, there are included amounts aggregating $23,182.17 paid to Don Sands, the job superintendent, for payroll and expenses. The evidence shows without contradiction that during the time that Sands received these payments he was also spending time and effort with respect to other jobs in other locations, particularly those being carried on simultaneously in Illinois and Indiana during the period that the Boone County, Missouri project was in progress. The evidence shows that Sands made a number of trips for these extraneous purposes and that particularly toward the end of the Missouri job he spent much of his time in the Missouri office dealing with the Illinois and Indiana problems. All of the money paid to Sands during the period of the Boone County, Missouri project was charged to that project (with one minor exception) and no attempt was made to deduct from the Missouri expenses any allocation for work done for the benefit of the other Safari projects.

The best that First Florida has been able to come up with by way of excuse is that at an earlier time when Sands was working primarily on some earlier project and being paid his salary from that project, he took some time for the benefit of the Missouri project. This justification was offered by Miller, who testified that "I suspect that while he was on some of our other jobs with Safari, he came into Boone County and did the same thing and his time was probably charged to the previous jobs, so we consider

that to sort of balance out." This explanation cannot be accepted for the reason that it is based on guesswork and because there is no basis upon which to verify any allocation of Sands' time among the various jobs. First Florida had the burden of proving the amount truly allocable to the Boone County, Missouri job, which it failed to do. *Bremer v. Mohr, supra.*

The testimony on behalf of First Florida also suggested by way of excuse the very long hours worked by Sands, so that regardless of the time which he may have taken off for other jobs, he still put in 40 hours every week on the Missouri job. Sands may have worked long hours, but it must be assumed that he was paid salary and bonuses commensurate with and to cover those long hours. The number of hours which he may have worked in any week does not dispense with the requirement of allocating to the Boone County, Missouri job only that share of Sands' time which was devoted to that job.

■ In this court tried case, the judgment of the trial court must be affirmed unless it failed to follow the correct principles of law, is not supported by substantial evidence, or is contrary to the weight of the evidence. *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The judgment here with respect to the inadequacy of the lien statement suffers from none of those infirmities.

## III.

### Right by First Florida to Allocate Payments

After the lien statement was filed, Safari made further payments aggregating $19,912.52. First Florida argues that Safari had the first right to determine how those payments should be allocated, but that when Safari failed to do so, then First Florida had the right to make allocation. *Title Insurance Corp. of St. Louis v. United States*, 432 S.W.2d 787 (Mo.App.1968); *Scott v. Twin City State Bank*, 537 S.W.2d 641 (Mo.App.1976). First Florida says that it therefore has the right to allocate the $19,912.52 toward wiping out all of the non-

lienable items erroneously included by it and that the trial court erred in refusing to give effect to that right. This line of argument contains a number of flaws.

■ In the first place, the question at issue is the sufficiency of the lien statement filed December 6, 1973. The payments now in question were not made until subsequent dates. It is difficult to see how payments made after expiration of the statutory six months could serve in any way to patch up the lien statement.

■ Further, First Florida did have an opportunity to make allocation when it first reported the payments aggregating $19,912.52, that is when it filed its court petition. The statement of account submitted by it at that time did not, however, attempt to apply any part of the payments in question as to any particular items, lienable or nonlienable. Instead, the First Florida statement attached to its petition showed a total lump sum debit balance due of $194,263.28, against which it applied total credits in one lump sum of $151,912.52. Since First Florida made no attempt whatsoever to make any allocation between lienable and nonlienable items, it is in no position to charge the trial court with having denied it that right.

Still further, as has already been pointed out, there are substantial sums (particularly with respect to the off-site office and Don Sands' salary) as to which there is no accounting basis upon which to make an allocation between what is lienable and nonlienable. Also to be noticed is the fact that the item of extras is being denied not because it is nonlienable, but rather because it is not due at all under the terms of the construction contract.

■ Although not included within its Point Relied On, First Florida attempts to expand its argument under this point by reliance upon the rule that when neither the debtor nor creditor has made application of a payment between items, "then the law will make the application as right and justice requires." *Title Insurance Corp. of St. Louis v. United States, supra.* Even if

this expanded argument were properly presented, it would have to be rejected. As already pointed out, there is no adequate accounting basis upon which such an allocation can be made. Still further, in view of its action with respect to the items of "extras", First Florida has not proved a case in which justice demands that the law make an allocation which First Florida itself did not make.

## IV.

### *Adequacy of the Property Description*

Statutory Section 429.080 requires that the lien statement set forth "a true description of the property, or so near as to identify the same, upon which the lien is intended to apply." Section 429.010 restricts the amount of land upon which the lien can be claimed "to the extent of one acre." In purported compliance with these statutory requirements, First Florida's lien statement described the premises upon which it claimed the lien as "Not more than One (1) acre" of land lying within a metes and bounds description of the entire 200 acre tract owned by Safari and on which the contract work had been done by First Florida. Respondents contend that this description is totally inadequate, inasmuch as it was incumbent upon First Florida to adequately describe the particular one acre claimed by it, in a way so that the one acre could be separately identified.

Although this point was not a ground relied upon by the trial court for its decision, respondents nevertheless have the right to urge this additional point in support of the result reached by the trial court. *McHenry v. Claspill*, 545 S.W.2d 690 (Mo. App.1976); *Guild Management Co. v. Oxenhandler*, 541 S.W.2d 687 (Mo.App.1976); *Sears, Roebuck & Co. v. Peerless Products, Inc.*, 539 S.W.2d 768 (Mo.App.1976); *C\_\_\_\_ L\_\_\_\_ R\_\_\_\_ v. L\_\_\_\_ B\_\_\_\_ R\_\_\_\_*, 555 S.W.2d 372 (Mo.App. 1977); *Corley v. Kiser*, 556 S.W.2d 218 (Mo. App.1977).

This problem of identification of one acre which exists as part of a larger tract has been the subject of much litigation. The many Missouri cases are collected in an annotation, "Sufficiency of notice, claim, or statement of mechanic's lien with respect to description or location of real property," 52 A.L.R.2d 12, Section 23(c) at page 91. The history of the Missouri rule, which the annotation states has been a checkered one, culminates with *Hertel Electric Company v. Gabriel*, 292 S.W.2d 95 (Mo.App.1956) which is the most recent Missouri decision on the subject. That opinion summarizes the Missouri rule to be that when a lien statement claims an undescribed one acre lying within an adequately described larger area, the determining factor as to the validity of the description consists of whether or not the contest is only between the original contracting parties or whether on the other hand the rights of third parties have intervened.

In the present case, the rights of third parties have intervened. At the time when First Florida filed its lien statement and at the time it filed this law suit, First Bank of Commerce held a deed of trust on the Safari property. In October, 1974, subsequent to the filing of the present law suit, the Bank foreclosed its deed of trust and six months later it sold the property to J. W. and Arlene Duncan. Soon thereafter the Duncans transferred the property to Duman Incorporated, which was the owner at the time of trial. Since the rights of Duman have now intervened, the failure of First Florida to identify the one acre tract claimed by it must be treated as fatal under *Hertel Electric Company v. Gabriel, supra.*

Attempting to answer this point, First Florida contends that it did identify the one acre claimed by it as being that acre upon which the restaurant building, which was the most expensive improvement on the entire area, is located. The difficulty with First Florida's contention is that the alleged description of this one acre appears for the first time in its post trial brief before the trial court. This very belated attempt at description cannot serve to remedy the failure to include a proper description in the

lien statement as required by Section 429.-080.

Affirmed.

All concur.